# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

Information associated with pres29@hotmail.com
that is stored at premises owned, maintained,
controlled, or operated by Microsoft Corporation

)
)
)
)
)
)

Case No. 19-915M (NJ)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

over which the Court has jurisdiction pursuant to Title 18, United States Code, Sections 2703 and 2711, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy to commit wire and mail fraud) and 1956 (money laundering).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jennifer Walkowski, FBI
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: August 29, 2019

*Judge's signature*

City and State: Milwaukee, Wisconsin

U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Jennifer M. Walkowski, being first duly sworn on oath, do hereby depose and say:

### Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI) of the United States Department of Justice. I have been so employed with the FBI since November 2, 2003.

2.      Since entering on duty with the FBI, I have investigated criminal violations, including but not limited to, bank robbery, Hobbs Act violations, theft of government property, wire fraud, mail fraud, mortgage fraud, health care fraud, corporate fraud, civil rights violations, public corruption, and money laundering. In my capacity as an FBI Special Agent, I am charged with investigating these and other criminal violations, including the violations pertaining to the matter described in this affidavit, which are violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy to commit wire and mail fraud) and 1956 (money laundering).

3.      All the information contained in this affidavit is based on my personal knowledge, my review of documents and other records obtained in the course of this investigation, information I have obtained in the course of this investigation from witnesses having personal knowledge of the events and circumstances described herein, and from other law enforcement officers involved in this investigation, all of whom I believe to be truthful and reliable. I have not included in this affidavit every detail I know about this investigation.

4.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for identity information, user profile

information, images, IP logs, email messages, instant messages, and other private data retained regarding Hotmail account pres29@hotmail.com, for the dates 01/01/2004 through 07/18/2013.

5.    Based upon information I believe to be truthful and reliable, I submit that this account was used during the commission of the following federal crimes: Title 18 U.S.C. § 1349 (Conspiracy to Commit Wire or Mail Fraud); Title 18 U.S.C. § 1341 (Fraud by Mail); Title 18 U.S.C. § 1343 (Fraud by Wire, Radio, or Television); and Title 18 U.S.C. §§ 1956, 1957 (Money Laundering).

6.    The statements contained in this affidavit are based in part on my training and experience, as well as on information provided to me by other law enforcement officers. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. Instead, I have set forth only the facts which I believe are necessary to establish the necessary foundation for the requested warrant. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**Facts Supporting Finding of Probable Cause that
Hotmail account pres29@hotmail.com Was Involved In Wire Fraud, Mail Fraud,
Conspiracy to Commit Mail and Wire Fraud, and Money Laundering**

8.    On April 3, 2018, and May 1, 2018, in Case No. 18-CR-62 (E.D. Wis.), a grand jury in this judicial district charged Defendants Brian Ganos and Mark Spindler by Indictment and Superseding Indictment, respectively, with, among other things, conspiring to commit mail

and wire fraud in connection with a set-aside contract fraud scheme, in violation of 18 U.S.C. § 1349. R. 1, 25.

9.      In Count 14 of the Superseding Indictment, the grand jury also charged Defendant Ganos with conspiring with others to launder the proceeds of the set-aside contract fraud scheme charged in Count One, in violation of 18 U.S.C. § 1956(h), by engaging in financial transactions involving use of, among other things, accounts of Defendant Sonag Company. *See* R. 25, Count 14, ¶¶ 45-53.

10.      In Counts 18-24 of the Superseding Indictment, the grand jury also charged Ganos with engaging in spending money laundering transactions, in violation of 18 U.S.C. § 1957, each of which alleged transactions involved Sonag Company accounts and property. R. 25, Counts 18-24.

11.      I have reviewed the facts alleged in Counts One, Fourteen, and 18-24 of the Superseding Indictment, a copy of which is attached hereto as Exhibit 1. I have also reviewed financial and other records pertinent to those counts. In particular, I have analyzed and summarized the financial transactions and have traced the sources of funds used in those transactions. I have also interviewed witnesses, and reviewed summaries of witness interviews, concerning the facts alleged in Counts One, Fourteen, and 18-24.

12.      Based on my above-described review, analysis, and summary of the financial records concerning the financial transactions discussed in Counts One and Fourteen, and charged in Counts 18-24, and based on the witnesses interviews I have conducted, and reports of interviews I have read, I attest that the facts alleged in Counts One, Fourteen, and 18-24 of the grand jury's Superseding Indictment are true and correct to the best of my knowledge.

13.     On June 20, 2019, Ganos pled guilty to counts 4 (Wire Fraud) and 10 (Mail Fraud) of the Superseding Indictment. Counts 4 and 10 charge executions of the conspiracy to devise and execute the scheme to defraud charged in count one. As part of Ganos' plea agreement, a copy of which is attached hereto as Exhibit 2, in the statements of facts he admitted to a lengthy recitation of facts regarding the conspiracy and scheme to defraud.

14.     Mark Spindler remains charged in count one (Conspiracy to Commit Wire or Mail Fraud), which is scheduled to be tried on January 21, 2020. Thus, evidence that supports the conspiracy and scheme to defraud charged in count one will be relevant to that trial. Evidence identified in the investigation gives probable cause to believe that the Hotmail account pres29@hotmail.com was used to generate email communications that are evidence of the conspiracy and scheme to defraud charged in count one.

15.     As alleged in the indictment, Ganos led the conspiracy and scheme to operate companies with straw owners who qualified as a socially and economically disadvantaged individual or as a service-disabled veteran, but who did not actually control the companies. The conspirators then fraudulently obtained small business program certifications as to the status of the companies and used those certifications to obtain over $200 million in federal, state, and local contract payments to which they were not entitled. Through the conspiracy and scheme, the conspirators enriched themselves, undermined the small business programs, and deprived honest small businesses of opportunities for work. Ganos hired Lori Michaud in 1996 as an employee of Sonag, to manage all of Sonag's financial and accounting matters. In 2004 and 2006 respectively, Ganos started up new companies Nuvo and C3T. Ganos expected Michaud to perform all financial and accounting duties for those companies also, but without diminishing his control over those companies, so in October of 2010, Ganos instructed her to establish her own

accounting business, and operate as a contractor. Michaud did so, and continued to work only for Ganos and the companies he controlled, from the same office in the building owned by Ganos where she had been working all along as a Sonag employee. At Ganos' direction, Michaud routinely transferred the profits from C3T and Nuvo to bank, investment and vendor accounts owned by Ganos. Ganos instructed her to make these transfers appear as if they were legitimate business expenses on the books of each company, by creating fraudulent accounting transactions. Ganos regularly used email to communicate with Michaud and others to operate the business and commit the scheme. Cooperating witnesses describe a work environment where most of the employees worked on job sites, and only approximately eight to twelve employees worked at the corporate office located on Florist Avenue at any given time. Therefore, much of the routine communication occurred by email. This information was corroborated during a search of the Florist Avenue corporate office, where agents seized several million emails located on the corporate server. Of those emails, over 800,000 were sent and received by the main conspirators. These emails were further analyzed by the investigative team, and found to include regular business communications to and from Ganos at both his official Sonag Construction Company business email address, briang@sonag.com and email address pres29@hotmail.com account which had been determined to be Ganos' personal Hotmail email address through investigation and witness interviews. Michaud confirmed this, and added the specific example of daily cash reports Ganos requested, which she would send to either briang@sonag.com or pres29@hotmail.com.

16. I reviewed official business emails for Sonag, Sonag Ready Mix, Nuvo, C3T and Pagasa. During the course of my review, I observed that Ganos used pres29@hotmail.com for official business, demonstrated by the following examples:

- On September 1, 2010, 12:02:13 CDT, Michaud sent an email from her official Sonag Construction Company business email address lorim@sonag.com (lorim@sonag.com) to Spindler's official Komisar & Spindler business email address mark@kscpafirm.com (mark@kscpafirm.com), briang@sonag.com, and pres29@hotmail.com. The subject of this email is: **Nuvo WC Audit Results Revised**. In this email, Michaud discusses payroll matters for Sonag Ready Mix truck drivers. This email demonstrates Ganos used his personal email for official business. Spindler is also included on the email demonstrating he has knowledge that Ganos is receiving business information on his personal email.

- On October 5, 2010, 15:40:18 CDT, Michaud sent an email from lorim@sonag.com to pres29@hotmail.com and briang@sonag.com. The subject of the email is: **My Business.** Michaud informed Ganos that she spoke with Spindler about what she needed to do to set up her company and separate retirement account, and asked how she should set up her business phone. This demonstrates Michaud's knowledge of Ganos' use of both pres29@hotmail.com and briang@sonag.com for business use.

- On May 31, 2011, 17:41:13 CDT, Spindler sent an email from mark@kscpafirm.com to Michaud's official LJM Accounting Services, Inc. business email address lori@ljmaccounting.com (lori@ljmaccounting.com) and to pres29@hotmail.com. The subject of this email is: **Re: Info you requested** and the attachment is labeled "2010 C3T financial.pdf" This was a reply to an earlier email Michaud sent to Spindler. Michaud writes "Can you also send the C3T Statements to Brian's other email address which is pres29@hotmail.com."

This demonstrates both Michaud's and Spindler's knowledge of Ganos' use of both pres29@hotmail.com and briang@sonag.com for business use.

- On December 3, 2011, 11:29:25 CST, Thomas Chambers replied to an email from his official business Shorewest Surety Services, Inc. business email address m tchambers@shorewestsurety.com (tchambers@shorewestsurety.com) to ljmaccounting.com, briang@sonag.com and to pres29@hotmail.com. The subject is: **Re: revised FS**. The body of the email discusses edits to the financial statements of Sonag, C3T and Nuvo. This demonstrates Michaud's and Chambers' knowledge of Ganos' use of both pres29@hotmail.com and briang@sonag.com for business use.

- On June 10, 2013, 14:26:21 CDT, Ganos forwarded an email briang@sonag.com to pres29@hotmail.com. The subject of the email is: **Fwd: Fireplace Tile Layout**. The forwarded email was sent from Odessa Millan's official C3T Construction Company business email address Odessa.millan@c3tco.com (Odessa.millan@c3tco.com). This email further corroborates Ganos' use of both pres29@hotmail.com and briang@sonag.com for official business use, and also indicates in this instance a preference for pres29@hotmail.com.

- On January 22, 2016, 14:53, Ganos sent a reply from pres29@hotmail.com to lori@ljmaccounting.com. The subject is: **Re: Bank Balance and Daily Cash.** Ganos writes "Thanks". This is part of an email chain beginning January 21, 2016 at 4:25 PM, during which Michaud sends attachments to Ganos labeled "Daily Cash – 2015 YTD Tri City" and "Daily Cash 2015 Nuvo YTD Tri City".

This email further corroborates Ganos' use of pres29@hotmail.com for official business use.

## BACKGROUND CONCERNING EMAIL

1.     In my training and experience, I have learned that Microsoft Corporation, provides a variety of on-line services, including electronic mail ("email") access, to the public. Microsoft allowed subscribers to obtain email accounts at the domain name Hotmail.com, like the email account listed in Attachment A. Microsoft acquired Hotmail in 1997. Microsoft released the final version of Hotmail in October 2011 and it was replaced by Outlook.com in 2012. Certain users of hotmail.com accounts continue to use their Hotmail account even though new accounts are now Outlook.com accounts. Subscribers obtain an account by registering with Microsoft. During the registration process, Microsoft asks subscribers to provide basic personal information. Therefore, the computers of Microsoft are likely to contain stored electronic communications (including retrieved and unretrieved email for Microsoft subscribers) and information concerning subscribers and their use of Microsoft services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

2.     In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

3.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

4. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

5. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute

evidence of the crimes under investigation because the information can be used to identify the account's user or users.

6.      Pursuant to 18 U.S.C. § 2713, this application seeks a warrant to search all responsive records and information under the control of Microsoft, a provider subject to the jurisdiction of this court, regardless of where Microsoft has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Hotmail's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses,

investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

### Conclusion

17.    Based on the facts that the grand jury found in the Superseding Indictment, the guilty plea that Ganos signed, and the above listed examples, I submit that there exists probable cause to believe that Ganos was substantially involved in the charged conspiracy with Mark Spindler to commit Wire Fraud and Mail Fraud, and that Hotmail account pres29@hotmail.com was used to facilitate those crimes.

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with pres29@hotmail.com that is stored at premises owned, maintained, controlled, or operated by Microsoft Corporation, a company headquartered at Redmond, Washington.

## ATTACHMENT B

### Particular Things to be Seized

### I.    Information to be disclosed by Microsoft Corporation (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.    The contents of all emails and instant messages associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.    The types of service utilized;

d.    All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

f.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Provider is hereby ordered to disclose the above information to the government within **14 DAYS** of the issuance of this warrant.

3

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), 1349 (conspiracy to commit wire and mail fraud) and 1956 (money laundering) those violations involving Brian Ganos and Mark Spindler and occurring after 01/01/2004 including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Evidence of mail fraud, wire fraud, conspiracy to commit wire and mail fraud and money laundering committed by Brian Ganos, Mark Spindler and other co-conspirators;

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) The identity of the person(s) who communicated with the user ID about matters relating to mail fraud, wire fraud, conspiracy to commit wire and mail fraud and money laundering, including records that help reveal their whereabouts.

4

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

           Plaintiff,

v.

           Case No. 18-CR-62 (PP-DEJ)

BRIAN L. GANOS,

           Defendant.

## PLEA AGREEMENT

1.     The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, Scott J. Campbell, Zachary J. Corey, and Michael A. Carter, Assistant United States Attorneys, and the defendant, Brian L. Ganos, individually and by attorney Stephen P. Hurley, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## CHARGES

2.     The defendant has been charged in counts one to twenty-four of a twenty-five-count superseding indictment. Counts one to twenty-four allege violations of Title 18, United States Code, Sections 2, 1341, 1343, 1349, 1956 and 1957. The defendant is the sole owner and president of Sonag Company, Inc. ("Sonag Company"), which has been charged in counts one and fourteen of the superseding indictment for violations of Title 18, United States Code, Sections 1349 and 1956.

3.     The defendant has read and fully understands the charges contained in the superseding indictment. He fully understands the nature and elements of the crimes with which

U.S. EXHIBIT

2

he has been charged, and the charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.  The defendant voluntarily agrees to plead guilty to counts four and ten of the superseding indictment, which are incorporated as part of this plea agreement as if set forth in full here.

5.  The defendant acknowledges, understands, and agrees that he is, in fact, guilty of counts four and ten of the superseding indictment. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts in Attachment A beyond a reasonable doubt. The defendant admits that the facts in Attachment A are true and correct and establish his guilt beyond a reasonable doubt.

This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6.  The parties understand and agree that each of the offenses to which the defendant will enter a plea of guilty carry the following maximum terms of imprisonment and fine: twenty (20) years and \$250,000. Each count also carries a mandatory special assessment of \$100 and a maximum of three (3) years of supervised release.

7.  The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNTS

8.  The government agrees to move to dismiss the remaining counts of the superseding indictment as they apply to the defendant at the time of sentencing, and to dismiss the original indictment in its entirety as it relates to Brian L. Ganos.

9.  The government agrees to move to dismiss counts one and fourteen of the

2

superseding indictment as they apply to Sonag Company, Inc. at the time of sentencing, and to

dismiss the original indictment in its entirety as it relates to Sonag Company, Inc.

## ELEMENTS

10.    The parties understand and agree that in order to sustain the charge of wire fraud

as set forth in the count four of the superseding indictment, the government must prove each of

the following propositions beyond a reasonable doubt:

First, that the defendant knowingly devised or participated in a scheme to defraud or to
obtain money or property by materially false or fraudulent pretenses, representations, or
promises;

Second, that the defendant did so with the intent to defraud;

Third, the scheme involved a materially false or fraudulent pretense, representation, or
promise; and

Fourth, that for the purpose of carrying out the scheme or attempting to do so, the
defendant caused interstate wire communications to take place, in the manner charged in the
particular count.

11.    The parties understand and agree that in order to sustain the charge of mail fraud

as set forth in count ten of the superseding indictment, the government must prove each of the

following propositions beyond a reasonable doubt:

First, that the defendant knowingly devised or participated in a scheme to defraud or to
obtain money or property by materially false or fraudulent pretenses, representations, or
promises;

Second, that the defendant did so with the intent to defraud;

Third, the scheme involved a materially false or fraudulent pretense, representation, or
promise; and

Fourth, that for the purpose of carrying out the scheme or attempting to do so, the
defendant knowingly caused the use of the United States Mails in the manner charged in the
particular count.

3

## SENTENCING PROVISIONS

12.     The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

13.     The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

14.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offenses set forth in counts four and ten of the superseding indictment. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction

15.     The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

### Sentencing Guidelines Calculations

16.     The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below

4

the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## **Relevant Conduct**

17.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

## **Base Offense Level**

18.     The parties agree to recommend to the sentencing court that the applicable base offense level for counts four and ten of the superseding indictment is seven (7) under Sentencing Guidelines Manual § 2B1.1(a)(1).

## **Specific Offense Characteristics**

19.     The parties acknowledge and understand that the government will recommend to the sentencing court that the loss amount should be determined to account for the entire fraudulent scheme alleged in the superseding indictment, and that a 28-level increase for a loss exceeding \$250,000,000 under Sentencing Guidelines Manual § 2B1.1(b)(1)(O) should be applied to the offense level. The parties acknowledge and understand that the defendant will not join this recommendation.

20.     The parties acknowledge and understand that the government will recommend to the sentencing court that a 2-level increase for use of sophisticated means under Sentencing Guidelines Manual § 2B1.1(b)(10)(C) is applicable to the offense charged in counts four and ten. The parties acknowledge and understand that the defendant reserves the right to argue against this enhancement.

5

## Role in the Offense

21.     The parties acknowledge and understand that the government will recommend to the sentencing court that a 4-level increase be given for an aggravating role in the offense pursuant to Sentencing Guidelines Manual § 3B1.1(a). The parties acknowledge and understand that the defendant reserves the right to argue against this enhancement entirely or for a 2-level or 3-level increase for a less aggravating role.

## Obstruction

22.     The parties acknowledge and understand that the government will recommend to the sentencing court that a 2-level increase should he given for obstruction of justice pursuant to Sentencing Guidelines Manual § 3C1.1. The parties acknowledge and understand that the defendant reserves the right to argue against this enhancement.

## Acceptance of Responsibility

23.     The parties acknowledge and understand that the government will recommend to the sentencing court that no decrease he given for acceptance of responsibility under Sentencing Guidelines Manual § 3E1.1 & application note 4, because the government contends that a 2-level increase for ohstruction of justice is warranted under Sentencing Guidelines Manual § 3C1.1. The parties acknowledge and understand that the defendant reserves the right to argue that a decrease for acceptance of responsibility under Sentencing Guidelines Manual § 3E1.1 should apply.

## Sentencing Recommendations

24.     Both parties reserve the right to provide the district court and the probation office with any and all information which might he pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors. Neither party will provide the

6

court or the probation office with information that has not been disclosed to the other party.

25.     Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

26.     The government agrees to recommend a sentence of no longer than 78 months of incarceration. The parties understand that the defendant is not required to join the government in making its recommendation, and that the defendant will be free to recommend that any different sentence be imposed.

## Court's Determinations at Sentencing

27.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

28.     The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

29.     The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable in full upon entry of the judgment of conviction.

30.     The defendant agrees to provide to the United States Attorney's Office (USAO) with this plea agreement, and also upon request of the USAO's Financial Litigation Unit (FLU)

7

during any period of probation or supervised release imposed by the court, a complete and sworn financial statement, for himself personally and for Sonag Company, Inc., on forms provided by the USAO and any documentation required by the forms. The defendant further agrees, upon request of the USAO whether made before—or if the defendant still owes outstanding financial obligations in this case, after—sentencing, to promptly cooperate in the identification of assets in which the defendant has an interest and cooperate in the liquidation of any such assets in order to fulfill his financial obligations imposed in this case.

## Fine

31.    The parties acknowledge and understand that the parties will recommend to the sentencing court to impose a fine of $5,000 against the defendant pursuant to Sentencing Guidelines Manual § 5E1.2(c)(3). Prior to sentencing, the defendant agrees to provide a check in the amount of $5,000 to the Clerk's Office of the Eastern District of Wisconsin specifying in a cover letter that the check is meant to satisfy any fine that is imposed in this case.

## Special Assessment

32.    The defendant agrees to pay the special assessment in the amount of $200 prior to or at the time of sentencing.

## Forfeiture

33.    The defendant acknowledges and understands that:

   a. By signing the stipulation and settlement agreement attached hereto as Attachment B, on behalf of himself and Trinity Marketing, Inc. ("Trinity Marketing"), the defendant has agreed (1) to withdraw his and Trinity Marketing's claims to the Chevrolet Corvette Stingray Convertible bearing vehicle identification number 1G1YE3D74E5117919, and (2) to the forfeiture of that vehicle, in the related civil forfeiture case *United States v. One 2014*

8

*Chevrolet Corvette Stingray Convertible bearing vehicle identification number (VIN)* 1G1YE3D74E5117919, 16-CV-1594 (E.D. Wis.);

b. By signing the stipulation and settlement agreement attached hereto as Attachment C, on behalf of himself and Trinity Marketing, the defendant has agreed (1) to withdraw his and Trinity Marketing's claims to the real property commonly known as 201 Zephyr Way, #2800, Winter Park, Colorado, and (2) upon resolution of the claim of Zephyr Mountain Lodge Association, Inc. to that real property, to the forfeiture of that real property, in the related civil forfeiture case *United States v. Certain Real Property Commonly Known as 201 Zephyr Way, #2800, Winter Park, Colorado*, 17-CV-208 (E.D. Wis.);

c. By signing the stipulation and settlement agreement attached hereto as Attachment D, on behalf of himself and Sonag Company, the defendant has agreed (1) to withdraw his and Sonag Company's claims to the Approximately $1,349,496.00 in United States currency from UBS account ending in 0703, and the remaining approximately $567,780.32 in United States currency from UBS account ending in 0589, and (2) to the forfeiture of those amounts of seized currency, in the related civil forfeiture case *United States v. Approximately $1,349,496.00 in United States currency from UBS account ending in 0703, et al.*, 17-CV-1770 (E.D. Wis.)

d. By signing the stipulation and settlement agreement attached hereto as Attachment E, on behalf of himself and Sonag I, LLC ("Sonag I"), the defendant has agreed (1) to withdraw his and Sonag I's claims to the real property commonly known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin, and (2) upon resolution of the claim of lienholder

9

Cornerstone Community Bank to that real property, to the forfeiture of that real property, in the related civil forfeiture case *United States v. Certain Real Property Commonly Known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin*, 18-CV-519 (E.D. Wis.).

34. The defendant agrees to cooperate, both individually and on behalf of any entity he controls, including Trinity Marketing, Sonag I, and Sonag Company, with the government in effectuating the terms of the civil forfeiture case settlement agreements attached hereto as Attachments B, C, D, and E, whose terms the parties hereby agree be incorporated into this plea agreement. The defendant agrees to take all reasonable steps requested by the United States, including executing documents needed to pass clear title to forfeitable assets to the United States and to facilitate the sale of such forfeitable assets. If called upon to do so by the government, the defendant agrees to testify truthfully in any judicial forfeiture proceeding regarding forfeiture matters, including any proceedings regarding any third-party claims as to property subject to forfeiture in this matter.

35. The parties stipulate to the immediate entry of a preliminary order of forfeiture imposing a money judgment of forfeiture against the defendant in the amount of $500,000.

36. The defendant agrees that the United States may immediately obtain entry of a preliminary order of forfeiture forfeiting, as substitute assets to satisfy the money judgment of forfeiture, each of the following property items:

> a. an undivided 1.9096% interest in Unit 49A of Bay Lake Tower at Disney's Contemporary Resort; a leasehold condominium (Orange County, FL); Membership No. 605401013178; Contract No. 10012304.000, Brian L. Ganos and Gianna Ganos (Estimate: 375 Points);

10

b. an undivided 0.5092% interest in Unit 53B of Bay Lake Tower at Disney's Contemporary Resort; a leasehold condominium (Orange County, FL); Membership No. 605401013178; Contract No. 10012304.001, Brian L. Ganos and Gianna Ganos (Estimate: 100 Points);

c. a 1967 Ford Mustang Shelby bearing VIN 67400F7A02797 (titled in the name of Brian L. Ganos);

d. a 1969 Chevrolet Camaro bearing VIN 124379N695109 (titled in the name of Brian L. Ganos);

e. a 2009 Ford Mustang Shelby GT500 bearing VIN1ZVHT88S295140756 (titled in the name of Brian L. Ganos); and

f. a 2016 Cadillac Escalade bearing VIN 1GYS4HKJ4GR416084 (currently titled in the name of Sonag Ready Mix LLC).

37. The parties agree that (a) the government shall be limited to seizing and forfeiting the property items identified in paragraph 36 for the purposes of satisfying the money judgment of forfeiture, and (b) only the net proceeds from the sale of the property items identified in paragraph 36—and the net proceeds of none of the property items to be civilly forfeited—shall be credited against the money judgment of forfeiture. Upon forfeiture of the items identified in paragraph 36, the government will file a satisfaction of the money judgment of forfeiture.

38. The parties agree that the government may immediately seize the property items identified in paragraphs 36(a)-36(e). If the sentencing court imposes a term of imprisonment, then within fourteen days after the defendant reports to prison, or if the sentencing court imposes no term of imprisonment, then within eight weeks after sentencing, the government may seize the property items identified in paragraph 36(f). The defendant agrees that he and his agents shall cooperate with the government's efforts to effect such seizures.

11

39.     If the sentencing court imposes a term of imprisonment, then within fourteen days after the defendant reports to prison the government will move to lift, on a prospective basis only, the March 1, 2019 restraining order that the court entered in this case to escrow the approximately $3,173 in weekly payments that Sonag Company is receiving from Sonag Ready Mix ("SRM") as payment for Sonag Company's sale to SRM of Sonag Company's one-half interest in SRM. Alternatively, if the sentencing court imposes no term of imprisonment, then within eight weeks after sentencing the government agrees to move to lift, on a prospective basis only, the March 1, 2019 restraining order. In either event, the parties agree that: (a) the government is entitled to retain, and to the immediate entry of a preliminary order of forfeiture forfeiting as a directly forfeitable asset under 18 U.S.C. § 982(a), all of the money that has been paid into the government's escrow account under the court's March 1, 2019 restraining order up to the date when the government moves to lift the restraining order on a prospective basis and (b) the defendant will have the right to receive such payments that SRM makes for Sonag Company's sale to SRM of Sonag Company's one-half interest in SRM thereafter.

40.     Within five days after entry of guilty pleas pursuant to this plea agreement, and acceptance of those pleas by the district court, the defendant agrees to dismiss, on behalf of himself and Sonag Company, Inc., his and Sonag Company's appeal of the restraining order in Case No. 19-1458 (7th Cir.).

41.     The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive him, notwithstanding the abatement of any underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if defendant had survived, and that determination shall be binding upon defendant's heirs, successors, and assigns until the agreed forfeiture, including any agreed money judgment amount, is collected in full.

12

## DEFENDANT'S WAIVER OF RIGHTS

42.     In entering this agreement, the defendant acknowledges and understands that he

surrenders any claims he may have raised in any pretrial motion, as well as certain rights which

include the following:

> a.     If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.
>
> b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.
>
> c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.
>
> d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.
>
> e.     At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

43.     The defendant acknowledges and understands that by pleading guilty he is

waiving all the rights set forth above. The defendant further acknowledges the fact that his

attorney has explained these rights to him and the consequences of his waiver of these rights.

13

The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

44. The defendant acknowledges and understands that he will be adjudicated guilty of the offenses to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

45. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

46. The defendant knowingly and voluntarily waives any claim or objection he may have based on statute of limitations.

## Further Civil or Administrative Action

47. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that, except as specified in the following paragraph, nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

14

48. The parties agree that if the defendant satisfies the financial and forfeiture-related obligations set forth in paragraphs 33-41 above, the United States will not pursue any civil liability the defendant has related to this matter, including any civil liability under the False Claims Act, 31 U.S.C. § 3729 *et seq.* The defendant has provided sworn financial statements to the United States with this plea agreement. The United States has relied on the accuracy and completeness of those financial statements in reaching this agreement, and the defendant warrants that those financial statements are complete, accurate, and current, to the best of his knowledge. The parties further agree that, if the United States learns of any asset(s) in which the defendant had an interest at the time of this agreement that have a value of $50,000 or more and that were not disclosed in the financial statements, the United States is immediately entitled to one hundred percent of any such undisclosed asset(s) from the defendant.

49. The defendant agrees not to contest or dispute any action by any federal agency to suspend or debar the defendant, Sonag Company, Inc., and any other entity in which the defendant has any interest, direct or indirect, presently or in the future, from government contracting.

## Further Action by Internal Revenue Service

50. Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charges alleged in the superseding indictment.

## GENERAL MATTERS

51. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

15

52. The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

53. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

54. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

55. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge against him personally or against Sonag Company, Inc. is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing.

## VOLUNTARINESS OF DEFENDANT'S PLEA

56. The defendant acknowledges, understands, and agrees that he will plead guilty

16

freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 6-3-19

BRIAN L. GANOS
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant.

Date: 06.03.19

STEPHEN P. HURLEY
Attorney for Defendant

For the United States of America:

Date: 6/3/2019

MATTHEW D. KRUEGER
United States Attorney

Date: 6-3-19

SCOTT J. CAMPBELL
ZACHARY J. COREY
MICHAEL A. CARTER
Assistant United States Attorneys

18

*United States v. Brian L. Ganos,* Case No. 18-CR-62

## Attachment A

1.      Beginning in approximately June 2004, and continuing through August 2016 in the State and Eastern District of Wisconsin and elsewhere, Brian L. Ganos knowingly participated with other persons and entities known and unknown in a scheme to defraud the United States, the State of Wisconsin, Milwaukee County, and other entities, and to obtain money and property from them, namely, payments on contracts and purchase orders, by means of materially false and fraudulent pretenses, representations, and promises, and with use of the United States mail and interstate wire communications.

### Background

2.      Each year, federal agencies contract to purchase goods and services. In addition, the federal government provides substantial funds to finance construction projects initiated by state and local governments, public transit agencies, and airport authorities.

3.      Some federal contracts are set aside to be awarded only to small businesses that are certified as meeting eligibility criteria relating to their size and status. Similarly, federal law aims to provide small businesses owned by socially and economically disadvantaged individuals an opportunity to compete for federally funded transportation contracts.

4.      Two such programs that assist small businesses are the following:

a.      The United States Small Business Administration's ("SBA") 8(a) Business Development Program ("8(a) Program") helps small businesses that are owned by socially and economically disadvantaged individuals. A firm certified through the 8(a) Program as a Small Disadvantaged Business is eligible to receive federal procurement contracts that are set aside for Small Disadvantaged Businesses.

b.      The United States Department of Transportation's ("US DOT") Disadvantaged Business Enterprise ("DBE") Program helps small businesses that are owned and controlled by socially and economically disadvantaged individuals by requiring that a portion of US DOT funds be directed to such firms. As a condition of receiving US DOT funds, the State of Wisconsin maintains a DBE Program according to US DOT regulations. The State of Wisconsin has authorized the Wisconsin Unified Certification Program, a cooperative of Wisconsin cities, counties, and airport authorities that recognize each other's DBE certifications. Milwaukee County is a member of the Wisconsin Unified Certification Program. A firm certified by Milwaukee County qualifies to receive DBE funds for federally funded transportation projects and also for projects funded by other members.

5.      The small business programs described above share certain eligibility criteria that a firm must meet, including the following:

a.  Size: The firm must be small according to SBA size standards and specified levels of average annual gross receipts;

b.  Ownership: The firm must be at least 51% percent owned by a socially and economically disadvantaged individual; and

c.  Control: The disadvantaged owner must control the firm. Control includes both day-to-day management and long-term decision-making authority. Factors relevant to control include whether the disadvantaged owner: (i) has the experience necessary to control the firm; (ii) has ultimate managerial control over others; (iii) receives higher compensation from the firm than others receive; and (iv) is dependent upon others for critical support, such as financing and bonding.

6.  To become certified under these small business programs, a firm must submit an application and supporting documentation to the certifying agency to show that it meets the eligibility criteria. Likewise, to maintain a certification, a firm must make periodic submissions confirming that it continues to meet the eligibility criteria.

7.  Any firm seeking a contract with the federal government must register in an online database maintained by the United States General Services Administration ("GSA") and make specific representations regarding the firm, including the firm's qualifications for small business programs. The firm must renew those representations each year and attest to their accuracy under the penalty of perjury.

8.  Contracting officials for federal agencies rely upon the GSA database in determining whether a firm is eligible to receive an 8(a) set-aside contract.

9.  Brian L. Ganos was the sole owner and president of Sonag Company, Inc. ("Sonag Company"), a Wisconsin corporation that performed construction work. Sonag Company operated out of an office building on West Florist Avenue in Milwaukee, Wisconsin ("the Florist Avenue building"). Ganos was also the purported Chief Executive Officer and Treasurer of Sonag Ready Mix, LLC ("Sonag Ready Mix"), of which Sonag Company owned approximately 50%.

10.  Jorge Lopez was a Hispanic-American and Minnesota resident who purported to be the 85% owner and president of Nuvo Construction Company, Inc. ("Nuvo"). From inception of Nuvo to the summer of 2004, Lopez worked for Nuvo. Subsequently, Lopez worked full-time on construction projects for Southwest Minnesota Housing Partnership ("SWMHP"), which is located in Slayton, Minnesota.

11.  Nuvo was a Wisconsin corporation that performed construction work and purported to provide ready-mix concrete. From the summer of 2004 forward, Nuvo's office was located in the Florist Avenue building. As noted, Lopez was Nuvo's nominal president and 85% owner. Ganos purported to own only 15% of Nuvo and to serve only as its vice president. Nuvo was certified by the SBA under the 8(a) Program as a Small Disadvantaged Business from 2004 until it graduated from the 8(a) Program in 2013. From 2005 to at least 2016, Nuvo was also certified by Milwaukee County as a DBE to provide ready-mix concrete.

2

12. Sonag Ready Mix was a Wisconsin limited liability company owned by Sonag Company and Nicholas Rivecca, Sr.. It principally provided ready-mix concrete for construction projects. The concrete operations were located in Menomonee Falls, Wisconsin, and several sites in Milwaukee, Wisconsin. From at least 2002 to approximately 2015, Sonag Ready Mix's business operations were conducted mainly in an office in Menomonee Falls, Wisconsin. Since 2015, Sonag Ready Mix's business operations have been conducted mainly in an office on West Hampton Avenue in Milwaukee, Wisconsin.

## Scheme to Defraud

13. Ganos's company—Sonag Company—performed construction work as a Small Disadvantaged Business certified in the 8(a) Program from 1994 to 2003. Lopez was an employee of Sonag.

14. In approximately 2001, as Ganos anticipated Sonag Company's graduation from the 8(a) Program, Ganos encouraged Lopez to join him in operating an company that would seek certification in the 8(a) Program.

15. Thereafter, Lopez changed the name of a business he owned to Nuvo, and transferred 15% ownership to Ganos, leaving Lopez with 85% ownership. For several years, Lopez attempted to operate Nuvo in Milwaukee with assistance from Ganos and Sonag Company.

16. On or about January 9, 2003, Ganos, Lopez, and others submitted Nuvo's application to Milwaukee County to be certified as a DBE for construction work. The application stated that Lopez devoted 100% of his time to Nuvo, and that Ganos devoted just 5% of his time to Nuvo. The application also stated that Lopez had responsibility for all financial and management decisions. The County certified Nuvo as a DBE based upon those representations.

17. Thereafter, Ganos, Lopez, and others submitted and/or caused to be submitted No Change Affidavits to Milwaukee County. The No Change Affidavits were submitted in Lopez's name and falsely represented that there had been no changes that would affect Nuvo's eligibility for DBE certification. The most recent No Change Affidavit was submitted in October 2015.

18. On or about June 9, 2004, Ganos, Lopez and others submitted and/or caused to be submitted Nuvo's application to the SBA to be certified under the 8(a) Program. The application stated that Lopez devoted 100% of his time to managing Nuvo, and that Ganos devoted 0% of his time to managing Nuvo. The application also stated that Ganos was not socially and economically disadvantaged for purposes of the application, and that Ganos did not (a) receive higher compensation than Lopez, nor (b) provide financial or bonding support, office space, or equipment to Nuvo.

19. Just a few days before Nuvo's 8(a) application was submitted, in June 2004, Lopez accepted an offer to begin full-time employment as a Senior Project Manager for SWMHP in Slayton, Minnesota. Around that time, Lopez moved to Minnesota and began working full

3

time for SWMHP. This was not disclosed to the SBA in Nuvo's 8(a) application.

20. On or about September 23, 2004, the SBA certified Nuvo as a Small Disadvantaged Business based upon the representations in Nuvo's application. Soon thereafter, in October 2004, Nuvo submitted a business plan, which upon the SBA's approval allowed Nuvo to bid on 8(a) set-aside contracts. The business plan listed Lopez as having an annual salary of $48,000 per year, and listed Ganos as receiving no annual salary at all. The business plan did not disclose that Lopez was working full-time in Minnesota for SWMHP.

21. Thereafter, from 2005 to 2012, Ganos, Lopez, and others submitted and caused to be submitted Nuvo's 8(a) annual updates to maintain Nuvo's 8(a) certification. These annual updates fraudulently represented that Lopez was Nuvo's full-time, day-to-day manager and that Ganos received no compensation from Nuvo.

22. From 2005 through 2012, Ganos, Lopez, and others caused Nuvo to register in GSA databases and complete annual representations in those databases in order to seek federal contracts. These submissions in the GSA databases falsely represented that Nuvo qualified for certification under the 8(a) Program.

23. In 2005, Lopez arranged for SWMHP to pay his compensation through a consulting contract rather than as an employee in order to conceal that Lopez was working full time on projects for SWMHP in Minnesota. Through the arrangement, SWMHP paid Lopez's compensation to Nuvo, and Nuvo then paid Lopez that same compensation through Nuvo's payroll system. Ganos was made aware of this arrangement by L.M.

24. From 2004 through 2016, as Ganos knew, multiple Nuvo employees earned more income from Nuvo than Lopez did.

25. On or about June 7, 2005, Ganos and others caused Nuvo to submit an application to Milwaukee County to expand Nuvo's DBE certification to include Ready Mix Concrete and Trucking. The application did not disclose that Lopez worked full-time in Minnesota for SWMHP. Milwaukee Country granted the expansion.

26. On or about June 18, 2008, Ganos and certain co-conspirators submitted and/or caused to be submitted a Five-Year Update Form to Milwaukee County—in Lopez's name and signature—that falsely swore that Nuvo continued to meet the DBE eligibility criteria.

27. From mid-2004 through 2016, Lopez had little involvement in Nuvo. Lopez did not have the benefits or burdens of ownership, nor did he have actual control of Nuvo. Instead, Ganos and others exercised control over key aspects of Nuvo, including long-term strategic decisions, finances, bonding, personnel, compensation, and day-to-day operations. Nor did Nuvo operate independently of other Ganos-controlled companies. Instead, aspects of Nuvo's operations, bonding, and finances were entwined with the other the companies, including Sonag Company.

28. Ganos and others exercised control over Nuvo's bonding, which was essential to obtaining federal set-aside contracts. Ganos arranged for Nuvo to obtain bonding through an

4

agent and personal friend, T.C., who provided bonding for Sonag Company and C3T. Nuvo's bonding was based upon guarantees by Sonag Company and Ganos personally, as well as financial statements that reported the consolidated finances of Sonag Company, Nuvo, and C3T.

29. Lopez rarely received accurate financial reports or made significant decisions about Nuvo's finances. When Nuvo began generating profits, substantial amounts of money were transferred from Nuvo to companies Ganos controlled, including Sonag Company.

30. Routinely, others executed contracts, checks, and other documents in Lopez's name; and others also possessed access to Lopez's email accounts so that emails could be sent and received in Lopez's name.

31. From the same office that handled Sonag Ready Mix operations, employees would prepare Nuvo quotes for customers that wanted to purchase from a DBE firm. Sonag Ready Mix employees would take orders for Nuvo and determine which concrete plant would fill the Nuvo order. The same Sonag Ready Mix employees would also generate and send Nuvo invoices. For a time, Sonag Ready Mix employees would simply place a "Nuvo" sticker on the top of invoices generated from Sonag Ready Mix's system. At no time did Lopez have any meaningful involvement in Nuvo's concrete operations.

32. By 2014, five trucks were titled in Nuvo's name. Ganos and others arranged to transfer Nuvo's trucks to a new entity, Grand C Trucking LLC, in which Lopez had no ownership stake. The transfers appeared to be bona fide sales when, in reality, neither Nuvo nor Lopez received any consideration for the trucks.

33. Ganos and others hired concrete truck drivers onto Nuvo's payroll. Although these drivers received paychecks from Nuvo, Sonag Ready Mix employees supervised these "Nuvo" drivers and made the personnel decisions regarding them—including hiring, firing, and compensation. Lopez had no control over these Nuvo drivers.

34. Ganos and others arranged for financial transactions to occur between Nuvo and Sonag Ready Mix that ensured that all profits from Nuvo concrete sales flowed through to Sonag Ready Mix.

35. Ganos and others used and/or caused to he used Nuvo's 8(a) Program certification and DBE certification to obtain numerous federal construction contracts that were set aside for Small Disadvantaged Businesses and concrete orders on contracts that were subject to DBE requirements.

36. The fraudulently obtained federal 8(a) set-aside contracts and concrete purchase orders were performed by various combinations of employees, equipment, and resources of companies that Ganos controlled, including Sonag Company and Sonag Ready Mix.

37. From 2004 through 2016, Nuvo received approximately $60,700,000 in payments for 8(a) set-aside contracts from the U.S. Department of Veterans Affairs and the U.S. Department of Defense. Nuvo was not entitled to those payments because Nuvo did not actually meet the 8(a) program eligibility requirements. Many of the payments were transmitted to Nuvo

5

by means of interstate wires.

38.    From 2005 through 2016, Nuvo received approximately $8,500,000 in payments for concrete purchase orders on projects that were subject to DBE requirements. Nuvo was not entitled to those payments because Nuvo did not actually meet the DBE program requirements. Nuvo routinely mailed invoices to obtain payment on those purchase orders through the United States mail.

39.    Of all participants in the scheme, Ganos obtained the largest share of the proceeds. Ganos directed the transfer of large sums from Nuvo to other companies he controlled and arranged for Nuvo to make various purchases and payments for Ganos's benefit.

### Execution of Scheme (Count Four)

40.    On or about November 30, 2015, Ganos caused the following wire communication to be transmitted in interstate commerce: a Construction Payment Invoice for $150,363.99 was submitted from Nuvo in Milwaukee, Wisconsin, through the Internet to the Defense Logistics Agency in Ogden, Utah, for work on Army contract number W911SA-12-D-0008, which was an 8(a) set-aside contract awarded to Nuvo.

### Execution of Scheme (Count Ten)

41.    On or about September 24, 2014, Ganos caused the following matter to be delivered by United States mail, according to the direction thereon, and to whom it was addressed: Nuvo invoice numbers 31701, 31702, 31754, 31812, 31857, and 31900, totaling $41,871.84, were mailed from Sonag Ready Mix, LLC, on behalf of Nuvo, to Zenith Tech, Inc,, Waukesha, Wisconsin, seeking payment for work on State Highway 20 in Racine County.

UNITED STATES OF AMERICA,

    Plaintiff,

v.

Case No. 16-CV-1594

ONE 2014 CHEVROLET CORVETTE
STINGRAY CONVERTIBLE, VEHICLE
IDENTIFICATION NUMBER (VIN)
1G1YE3D74E5117919, WITH ALL
APPURTENANCES AND ATTACHMENTS
THEREON,

    Defendant.

## STIPULATION AND SETTLEMENT AGREEMENT

The Plaintiff, the United States of America, by its attorneys, Matthew D. Krueger, United

States Attorney for the Eastern District of Wisconsin, and Scott J. Campbell, Assistant United

States Attorney; and the claimants, Brian Ganos and Trinity Marketing Services, Inc., by and

through their attorney, Andrew W. Erlandson (collectively referred to as the "Parties"), hereby

stipulate and agree as follows:

1.    On November 30, 2016, the United States filed a Verified Complaint for Civil

Forfeiture *In Rem* against the defendant property, one 2014 Chevrolet Corvette Stingray

Convertible bearing vehicle identification number (VIN) 1G1YE3D74E5117919, with all

appurtenances and attachments thereon (the "Defendant Property"). The Complaint alleges that

the Defendant Property was involved in a money laundering transaction in violation of 18 U.S.C.

§§ 1956(a)(1) and 1957, and is therefore subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(A).

2. On January 4, 2017, Brian Ganos and Trinity Marketing Services, Inc. (collectively referred to as the "Claimants") filed claims to the Defendant Property and answers to the Complaint. Claimants warrant and represent that they are the sole owners of the Defendant Property.

3. No other claims or answers have been filed in this action as to the Defendant Property, and pursuant to Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the time for filing a claim and answer in this action has passed.

4. The Parties hereby agree to settle this action on the terms set forth below.

5. The Claimants hereby consent and agree to the immediate entry of a judgment of forfeiture on the Complaint for Civil Forfeiture *in rem* consistent with the following terms:

> A. Claimants Brian Ganos and Trinity Marketing Services, Inc. hereby withdraw their claims to the Defendant 2014 Chevrolet Corvette Stingray Convertible bearing vehicle identification number 1G1YE3D74E5117919.

> B. Claimants Brian Ganos and Trinity Marketing Services, Inc. agree that all right, title, and interest in the Defendant 2014 Chevrolet Corvette Stingray Convertible bearing vehicle identification number 1G1YE3D74E5117919 shall be forfeited to and shall vest in the United States of America for disposition according to law.

6. The Claimants hereby waive all time limits set forth in 18 U.S.C. § 983 and any claim to further notice of forfeiture.

7. Each party shall bear its own costs, attorney's fees, and expenses.

8. The Claimants hereby waive any and all claims they have or might have against the United States of America, the United States Department of Justice, the United States Marshal

2

Service, the United States Department of Defense – Office of the Inspector General, the Federal Bureau of Investigation, and all agents, officers, and employees thereof (hereinafter the "Released Parties"), relating to the seizure or forfeiture of the Defendant Property, including any claims for loss of use, or lost profits or interest.

9.      The Claimants agree to hold the Released Parties harmless from any and all claims of third parties pertaining to the Defendant Property.

10.     This agreement is contingent upon Claimant Brian Ganos's entry into, and faithful execution of his obligations and agreements under his plea agreement to be filed in the criminal case *United States v. Brian L. Ganos, et al.*, Case No. 18-CR-62 (E.D. Wis.). Claimant Brian Ganos understands that this Stipulation and Settlement Agreement will be made an attachment to his plea agreement and will be filed in both this civil forfeiture case and as an attachment to his plea agreement in the criminal case.

11.     This Stipulation and Settlement Agreement, and the plea agreement to which it will be made an attachment in the criminal case, contain the entire agreements between the Claimants and the United States of America related to the forfeiture of the Defendant Property named in this case.

12.     The Court shall retain jurisdiction in this cause for the purpose of enforcing the terms of this Stipulation and Settlement Agreement.

___6/3/19___
Date

SCOTT J. CAMPBELL
Assistant United States Attorney

3

06 03 19
Date

ANDREW W. ERLANDSON
Attorney for Claimants Brian Ganos and Trinity Marketing
Services, Inc.

6 - 3 - 19
Date

BRIAN GANOS
Claimant

6 - 3 - 19
Date

TRINITY MARKETING SERVICES, INC., by its
President, BRIAN GANOS
Claimant

4

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 17-CV-208

CERTAIN REAL PROPERTY
commonly known as
201 ZEPHYR WAY, #2800,
WINTER PARK, COLORADO,

Defendant.

## STIPULATION AND PARTIAL SETTLEMENT AGREEMENT RESOLVING CLAIMS OF CLAIMANTS BRIAN GANOS AND TRINITY MARKETING SERVICES, INC.

The Plaintiff, the United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Scott J. Campbell, Assistant United States Attorney; and Claimants Brian Ganos and Trinity Marketing Services, Inc., by and through their attorney, Andrew W. Erlandson, hereby stipulate and agree as follows:

1. On February 15, 2017, the United States filed a Verified Complaint for Civil Forfeiture *In Rem* against the defendant real property commonly known as 201 Zephyr Way, #2800, Winter Park, Colorado, with all improvements, appurtenances, and attachments thereon (the "Defendant Real Property"). The Complaint alleges that the Defendant Real Property was involved in a money laundering transaction in violation of 18 U.S.C. §§ 1956(a)(1) and 1957, and is therefore subject to forfeiture to the United States of America pursuant to 18 U.S.C. § 981(a)(1)(A).

2. On March 21, 2017, Brian Ganos and Trinity Marketing Services, Inc. filed claims to the Defendant Real Property and answers to the Complaint. Claimants Brian Ganos and Trinity Marketing Services, Inc. warrant and represent that they are the sole owners of the Defendant Real Property.

3. On May 12, 2017, Zephyr Mountain Lodge Association, Inc. ("ZMLA") through its attorney, Daniel T. Flaherty, filed a claim to the Defendant Real Property. The parties understand and agree that this settlement agreement does not resolve Claimant ZMLA's claim. However, the United States agrees that it shall use its best efforts in future negotiations with Claimant ZMLA to ensure that any valid claim of Claimant ZMLA as to the Defendant Real Property is fully satisfied using proceeds of the anticipated sale of the Defendant Real Property and without recourse to either Brian Ganos or Trinity Marketing Services, Inc.

4. No other person or entity has filed a claim or answer in this action as to the Defendant Real Property, and pursuant to Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the time for filing a claim and answer in this action has passed.

5. The Plaintiff United States and Claimants Brian Ganos and Trinity Marketing Services, Inc. hereby agree to settle the claims of Claimants Brian Ganos and Trinity Marketing Services, Inc. on the terms set forth below.

6. Claimants Brian Ganos and Trinity Marketing Services, Inc. hereby withdraw their claims to the Defendant Real Property commonly known as 201 Zephyr Way, #2800, Winter Park, Colorado.

7. Claimants Brian Ganos and Trinity Marketing Services, Inc. agree that, if and when Claimant ZMLA withdraws its claim as to the Defendant Real Property or Claimant

2

ZMLA's claim to that property is otherwise dismissed, then all right, title, and interest in the Defendant Real Property commonly known as 201 Zephyr Way, #2800, Winter Park, Colorado shall be forfeited to and shall vest in the United States of America for disposition according to law.

8.    Claimants Brian Ganos and Trinity Marketing Services, Inc. hereby waive all time limits set forth in 18 U.S.C. § 983 and any claim to further notice of forfeiture.

9.    Each party to this agreement shall bear its own costs, attorney's fees, and expenses.

10.    Claimants Brian Ganos and Trinity Marketing Services, Inc. hereby waive any and all claims they have or might have against the United States of America, the United States Department of Justice, the United States Marshal Service, the United States Department of Defense – Office of the Inspector General, the Federal Bureau of Investigation, and all agents, officers, and employees thereof (hereinafter the "Released Parties"), relating to the forfeiture of the Defendant Real Property, including any claims for lost profits or interest.

11.    Claimants Brian Ganos and Trinity Marketing Services, Inc. agree to hold the Released Parties harmless from any and all claims of third parties pertaining to the Defendant Real Property.

12.    This agreement is contingent upon Claimant Brian Ganos's entry into, and faithful execution of his obligations and agreements under his plea agreement to be filed in the criminal case *United States v. Brian L. Ganos, et al.*, Case No. 18-CR-62 (E.D. Wis.). Claimant Brian Ganos understands that this Stipulation and Partial Settlement Agreement will be made an attachment to his plea agreement and will be filed in both this civil forfeiture case and as an attachment to his plea agreement in the criminal case.

3

13.     This Stipulation and Partial Settlement Agreement, and the plea agreement to which it will be made an attachment in the criminal case, contain the entire agreements between Claimants Brian Ganos and Trinity Marketing Services, Inc. and the United States of America related to the resolution of the claims of Claimants Brian Ganos and Trinity Marketing Services, Inc. as to the Defendant Real Property.

14.     The Court shall retain jurisdiction in this cause for the purpose of enforcing the terms of this Stipulation and Partial Settlement Agreement.

6/3/19
Date

SCOTT J. CAMPBELL
Assistant United States Attorney

06 03 19
Date

ANDREW W. ERLANDSON
Attorney for Claimants Brian Ganos and Trinity Marketing Services, Inc.

6-3-19
Date

BRIAN GANOS
Claimant

6-3-19
Date

TRINITY MARKETING SERVICES, INC., by its President, BRIAN GANOS
Claimant

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
AT LAW AND IN ADMIRALTY

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

APPROXIMATELY $1,349,496.00 IN UNITED
STATES CURRENCY FROM UBS ACCOUNT
ENDING IN 0703, and

APPROXIMATELY $879,740.02 IN UNITED
STATES CURRENCY FROM UBS ACCOUNT
ENDING IN 0589,

        Defendants.

Case No. 17-CV-1770

## STIPULATION AND SETTLEMENT AGREEMENT

The Plaintiff, the United States of America, by its attorneys, Matthew D. Krueger, United

States Attorney for the Eastern District of Wisconsin, and Scott J. Campbell, Assistant United

States Attorney; and the claimants, Brian Ganos and Sonag Company, Inc., by and through their

attorney, Andrew W. Erlandson (collectively referred to as the "Parties"), hereby stipulate and

agree as follows:

1. On December 21, 2017, the United States filed a First Amended Verified

Complaint for Civil Forfeiture *In Rem* against the following defendant properties:

    A.     Approximately $1,349,496.00 in United States currency from UBS
           account ending in 0703 held in the name of Sonag Company Inc., Pleg'd
           Coll Acct-FBO UBS Bank USA ("UBS 0703"); and

    B.     Approximately $879,740.02 in United States currency from UBS account
           ending in 0589 held in the name of Sonag Company Inc., Pleg'd Coll
           Acct-FBO UBS Bank USA ("UBS 0589"),

(collectively referred to as the "Defendant Properties").

2.     The first amended complaint alleges that the Defendant Properties (1) constitute or were derived from proceeds traceable to specified unlawful activity, namely, wire fraud and wire fraud conspiracy, committed in violation of Title 18, United States Code, Sections 1343 and 1349, and are therefore subject to forfeiture to the United States of America under Title 18, United States Code, Section 981(a)(1)(C), with cross-references to Title 18, United States Code, Sections 1956(c)(7) and 1961(1); and (2) were involved in concealment money laundering transactions and a money laundering conspiracy, committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(h), and are therefore subject to forfeiture to the United States of America under Title 18, United States Code, Section 981(a)(1)(A).

3.     On January 17, 2018, UBS Financial Services Inc. and UBS Bank USA (collectively referred to as the "UBS Claimants") filed a claim to the Defendant Properties and an answer to the first amended complaint.

4.     The UBS Claimants' claim has now been fully resolved as follows:

   A.     On or about September 28, 2018, the Parties and the UBS Claimants entered into an agreement to return a total of $311,959.70 of the Defendant Properties to the UBS Claimants in full satisfaction of the UBS Claimants' claim in this case.

   B.     The Parties fulfilled all terms of that agreement, and the $311,959.70 was paid to the UBS Claimants from the Defendant UBS 0589.

   C.     Therefore, the remaining funds in Defendant UBS 0589 total approximately $567,780.32.

   D.     On January 9, 2019, the Court ordered that the UBS Claimants' claim was satisfied in full and that UBS Claimants' claim was withdrawn as to all of the remaining funds comprising the Defendant Properties.

5. On January 29, 2018, Brian Ganos and Sonag Company, Inc. filed claims to the Defendant Properties and answers to the first amended complaint. Brian Ganos and Sonag Company, Inc. warrant and represent that they are the sole owners of the Defendant Properties.

6. No other claims or answers have been filed in this action as to the Defendant Properties, and pursuant to Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the time for filing a claim and answer in this action has passed.

7. The Parties hereby agree to settle this action on the terms set forth below.

8. The claimants, Brian Ganos and Sonag Company, Inc. (collectively referred to as the "Claimants"), hereby consent and agree to the immediate entry of a judgment of forfeiture on the Complaint for Civil Forfeiture *in rem* consistent with the following terms:

   A. Claimants Brian Ganos and Sonag Company, Inc. hereby withdraw their claims to the following defendant properties:

      i. Approximately $1,349,496.00 in United States currency from UBS account ending in 0703, and

      ii. The remaining approximately $567,780.32 in United States currency from UBS account ending in 0589.

   B. Claimants Brian Ganos and Sonag Company, Inc. agree that all right, title, and interest in the following defendant properties shall be forfeited to and shall vest in the United States of America for disposition according to law:

      i. Approximately $1,349,496.00 in United States currency from UBS account ending in 0703, and

      ii. The remaining approximately $567,780.32 in United States currency from UBS account ending in 0589.

9. The Claimants hereby waive all time limits set forth in 18 U.S.C. § 983 and any claim to further notice of forfeiture.

10. Each party shall bear its own costs, attorney's fees, and expenses.

3

11.    The Claimants hereby waive any and all claims they have or might have against the United States of America, the United States Department of Justice, the United States Marshal Service, the United States Department of Defense – Office of the Inspector General, the Federal Bureau of Investigation, and all agents, officers, and employees thereof (hereinafter the "Released Parties"), relating to the seizure or forfeiture of the Defendant Properties, including any claims for loss of use, or lost profits or interest.

12.    The Claimants agree to hold the Released Parties harmless from any and all claims of third parties pertaining to the Defendant Properties.

13.    This agreement is contingent upon Claimant Brian Ganos's entry into, and faithful execution of his obligations and agreements under his plea agreement to be filed in the criminal case *United States v. Brian L. Ganos, et al.*, Case No. 18-CR-62 (E.D. Wis.). Claimant Brian Ganos understands that this Stipulation and Settlement Agreement will be made an attachment to his plea agreement and will be filed in both this civil forfeiture case and as an attachment to his plea agreement in the criminal case.

14.    This Stipulation and Settlement Agreement, and the plea agreement to which it will be made an attachment in the criminal case, contain the entire agreements between the Claimants and the United States of America related to the forfeiture of the remaining Defendant Property amounts in this case.

15.    The Court shall retain jurisdiction in this cause for the purpose of enforcing the terms of this Stipulation and Settlement Agreement.

6/3/19
Date

SCOTT J. CAMPBELL
Assistant United States Attorney

4

06.03.19
Date

_____
ANDREW W. ERLANDSON
Attorney for Claimants Brian Ganos and Sonag Company,
Inc.

6-3-19
Date

_____
BRIAN GANOS
Claimant

6-3-19
Date

_____
SONAG COMPANY, INC., by its registered agent,
BRIAN GANOS
Claimant

5

UNITED STATES OF AMERICA,

Plaintiff,

v.

Case No. 18-CV-519

CERTAIN REAL PROPERTY
commonly known as
5500 (TO INCLUDE 5510) WEST FLORIST
AVENUE, MILWAUKEE, WISCONSIN,

Defendant.

## STIPULATION AND PARTIAL SETTLEMENT AGREEMENT
## RESOLVING CLAIMS OF CLAIMANTS BRIAN GANOS AND SONAG I, LLC

The Plaintiff, the United States of America, by its attorneys, Matthew D. Krueger, United

States Attorney for the Eastern District of Wisconsin, and Scott J. Campbell, Assistant United

States Attorney; and Claimants Brian Ganos and Sonag I, LLC, by and through their attorney,

Andrew W. Erlandson, hereby stipulate and agree as follows:

1.    On April 3, 2018, the United States filed a Verified Complaint for Civil Forfeiture

*In Rem* against the defendant real property commonly known as 5500 (to include 5510) West

Florist Avenue, Milwaukee, Wisconsin, with all improvements, appurtenances, and attachments

thereon (the "Defendant Real Property"). The Complaint alleges that the Defendant Real

Property was involved in a conspiracy to engage in concealment money laundering, as well as

concealment money laundering transactions, committed in violation of 18 U.S.C. §§ 1956(h) and

1956(a)(1)(B)(i), respectively, and is therefore subject to forfeiture to the United States of

America under 18 U.S.C. § 981(a)(1)(A).

2. On April 24, 2018, Brian Ganos and Sonag I, LLC filed claims to the Defendant Real Property and answers to the Complaint. Claimants Brian Ganos and Sonag I, LLC warrant and represent that they are the sole owners of the Defendant Real Property.

3. On May 4, 2018, Cornerstone Community Bank ("CCB") through its attorney, Thomas G. Boyer, filed a claim to the Defendant Real Property. On May 16, 2018, CCB filed an answer to the Complaint. The parties understand and agree that this settlement agreement does not resolve Claimant CCB's claim. However, the United States agrees that it shall use its best efforts in future negotiations with Claimant CCB to ensure that any valid claim of Claimant CCB as to the Defendant Real Property is fully satisfied using proceeds of the anticipated sale of the Defendant Real Property and without recourse to either Brian Ganos or Sonag I, LLC.

4. No other person or entity has filed a claim or answer in this action as to the Defendant Real Property, and pursuant to Rule G(5) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the time for filing a claim and answer in this action has passed.

5. The Plaintiff United States and Claimants Brian Ganos and Sonag I, LLC hereby agree to settle the claims of Claimants Brian Ganos and Sonag I, LLC on the terms set forth below.

6. Claimants Brian Ganos and Sonag I, LLC hereby withdraw their claims to the Defendant Real Property commonly known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin.

7. Claimants Brian Ganos and Sonag I, LLC agree that, if and when Claimant CCB withdraws its claim as to the Defendant Real Property or Claimant CCB's claim to that property is otherwise dismissed, then all right, title, and interest in the Defendant Real Property

2

commonly known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin shall
be forfeited to and shall vest in the United States of America for disposition according to law.

8. Claimants Brian Ganos and Sonag I, LLC hereby waive all time limits set forth in
18 U.S.C. § 983 and any claim to further notice of forfeiture.

9. Each party to this agreement shall bear its own costs, attorney's fees, and
expenses.

10. Claimants Brian Ganos and Sonag I, LLC hereby waive any and all claims they
have or might have against the United States of America, the United States Department of
Justice, the United States Marshal Service, the United States Department of Defense – Office of
the Inspector General, the Federal Bureau of Investigation, and all agents, officers, and
employees thereof (hereinafter the "Released Parties"), relating to the forfeiture of the Defendant
Real Property, including any claims for lost profits or interest.

11. Claimants Brian Ganos and Sonag I, LLC agree to hold the Released Parties
harmless from any and all claims of third parties pertaining to the Defendant Real Property.

12. This agreement is contingent upon Claimant Brian Ganos's entry into, and faithful
execution of his obligations and agreements under his plea agreement to be filed in the criminal
case *United States v. Brian L. Ganos, et al.*, Case No. 18-CR-62 (E.D. Wis.). Claimant Brian
Ganos understands that this Stipulation and Partial Settlement Agreement will he made an
attachment to his plea agreement and will be filed in both this civil forfeiture case and as an
attachment to his plea agreement in the criminal case.

13. This Stipulation and Partial Settlement Agreement, and the plea agreement to
which it will be made an attachment in the criminal case, contain the entire agreements between
Claimants Brian Ganos and Sonag I, LLC and the United States of America related to the

3

resolution of the claims of Claimants Brian Ganos and Sonag I, LLC as to the Defendant Real

Property.

14.     The Court shall retain jurisdiction in this cause for the purpose of enforcing the

terms of this Stipulation and Partial Settlement Agreement.

6/3/19
Date

SCOTT J. CAMPBELL
Assistant United States Attorney

06 03 19
Date

ANDREW W. ERLANDSON
Attorney for Claimants Brian Ganos and Sonag I, LLC

6-3-19
Date

BRIAN GANOS
Claimant

6-3-19
Date

SONAG I, LLC, by its owner and authorized
representative, BRIAN GANOS
Claimant

4

2018 MAY -1  P 3 0b

UNITED STATES OF AMERICA,

STEPHEN C. DRIES
CLERK

Plaintiff,

v.                                Case No. 18-CR-62

BRIAN L. GANOS,                   [18 U.S.C. §§ 2, 4, 1341, 1343, 1349, 1956 &
MARK F. SPINDLER,                 1957]
SONAG COMPANY, INC., and
NUVO CONSTRUCTION COMPANY, INC.,

Defendants.

## SUPERSEDING INDICTMENT

### COUNT ONE
### (Conspiracy)

#### THE GRAND JURY CHARGES:

1.    Beginning by June 2004, and continuing through August 2016, in the State and

Eastern District of Wisconsin and elsewhere,

### BRIAN L. GANOS,
### MARK F. SPINDLER,
### SONAG COMPANY, INC., and
### NUVO CONSTRUCTION COMPANY, INC.

knowingly conspired with each other, and other persons and entities known and unknown to the

Grand Jury, to devise and participate in a scheme to defraud the United States, the State of

Wisconsin, Milwaukee County, and other entities, and to obtain money and property from them,

namely, payments on contracts and purchase orders, by means of materially false and fraudulent

pretenses, representations, and promises, and with use of the United States mail and interstate

wire communications, in violation of Title 18, United States Code, Sections 1341 and 1343.

U.S. EXHIBIT
1

2.    The essence of the conspiracy and scheme was to operate companies with straw owners who qualified as a socially and economically disadvantaged individual or as a service-disabled veteran, but who did not actually control the companies. The conspirators then fraudulently obtained small business program certifications as to the status of the companies and used those certifications to obtain over $200 million in federal, state, and local contract payments to which they were not entitled. Through the conspiracy and scheme, the conspirators enriched themselves, undermined the small business programs, and deprived honest small businesses of opportunities for work.

### Background – Small Business Programs for Government Contracting

At all times material to this Indictment:

3.    Each year, federal agencies award contracts to purchase goods and services. In addition, the federal government provides substantial funds to finance construction projects initiated by state and local governments, public transit agencies, and airport authorities.

4.    Some federal contracts are set aside to be awarded only to small businesses that are certified as meeting eligibility criteria relating to their size and status. Similarly, federal law aims to provide small businesses owned by socially and economically disadvantaged individuals with opportunities to compete for federally funded transportation contracts.

5.    The defendants' fraudulent scheme involved three programs that certify small businesses for government contracting:

a.    The United States Small Business Administration's ("SBA") 8(a) Business Development Program ("8(a) Program") helps small businesses that are owned by socially and economically disadvantaged individuals. A firm certified through the 8(a) Program as a Small Disadvantaged Business is eligible to receive federal procurement contracts that are set aside for Small Disadvantaged Businesses.

b.    The United States Department of Veterans Affairs' ("VA") Service-Disabled Veteran Owned Small Business ("SDVOSB") Program helps small businesses that are owned by service-disabled veterans. A qualified SDVOSB is eligible to

2

receive federal procurement contracts that are set aside for such businesses. The VA's Center for Veteran Enterprises ("CVE") is responsible for verifying whether a firm qualifies as an SDVOSB.

c.   The United States Department of Transportation's ("US DOT") Disadvantaged Business Enterprise ("DBE") Program helps small businesses that are owned by socially and economically disadvantaged individuals by requiring that a portion of US DOT funds be directed to such firms. As a condition of receiving US DOT funds, the State of Wisconsin maintains a DBE Program according to US DOT regulations. The State of Wisconsin has authorized the Wisconsin Unified Certification Program, a cooperative of Wisconsin cities, counties, and airport authorities that recognize each other's DBE certifications. Milwaukee County is a member of the Wisconsin Unified Certification Program. A firm certified by Milwaukee County qualifies to receive DBE funds for federally funded transportation projects and also for projects funded by other members.

6.   The small business programs described above share certain eligibility criteria that

a firm must meet, including the following:

a.   Size: The firm must be small according to SBA size standards and specified levels of average annual gross receipts.

b.   Ownership: The firm must be at least 51% percent owned by a socially and economically disadvantaged individual in the case of the 8(a) Program and the DBE Program, or by a service-disabled veteran in the case of the SDVOSB Program.

c.   Control: The disadvantaged owner or service-disabled veteran owner must control the firm. Control includes both day-to-day management and long-term decision-making authority. Factors relevant to control include whether the disadvantaged owner or service-disabled veteran owner: (i) has the experience necessary to control the firm; (ii) has ultimate managerial control over others; (iii) receives higher compensation from the firm than others receive; and (iv) is dependent upon others for critical support, such as financing and bonding.

7.   To become certified under these small business programs, a firm must submit an

application and supporting documentation to the certifying agency to show that it meets the

eligibility criteria. Likewise, to maintain a certification, a firm must make periodic submissions

confirming that it continues to meet the eligibility criteria.

8.   Any firm seeking a contract with the federal government must register in an

online database maintained by the United States General Services Administration ("GSA") and

3

make specific representations regarding the firm, including the firm's qualifications for small business programs. The firm must renew those representations each year and attest to their accuracy under the penalty of perjury.

9.      In addition, to be eligible for VA contracts set aside for SDVOSBs, a firm must be listed on the VA's Vendor Information Pages online database as meeting the SDVOSB Program requirements.

10.     Contracting officials for federal agencies rely upon these certifications in the GSA database and the VA's Vendor Information Pages in determining whether a firm is eligible to receive a set-aside contract.

## Background – Roles of Persons and Entities Involved in the Conspiracy and Scheme

At all times material to this Indictment:

11.     Brian L. Ganos was the sole owner and president of Sonag Company, Inc. ("Sonag Company"), a Wisconsin corporation that performed construction work. Sonag Company operated out of an office building on West Florist Avenue in Milwaukee, Wisconsin ("the Florist Avenue building"). Ganos was also the purported Chief Executive Officer and Treasurer of Sonag Ready Mix, LLC ("Sonag Ready Mix"), of which Sonag Company owned approximately 50%.

12.     Mark F. Spindler was the co-owner of Komisar and Spindler, s.c., an accounting firm located in Menomonee Falls, Wisconsin. Spindler performed outside accounting services for Ganos-affiliated companies, including Sonag Company, Nuvo Construction Company, Inc. ("Nuvo"), C3T, Inc., and Sonag Ready Mix.

13.     J.L. was a Hispanic-American and Minnesota resident who purported to be the 85% owner and president of Nuvo. J.L. worked full-time on construction projects for Southwest Minnesota Housing Partnership ("SWMHP"), which is located in Slayton, Minnesota.

4

14.     J.H. worked for companies affiliated with Ganos and supervised their construction operations. J.H. worked principally in the Florist Avenue building. From C3T's formation in 2006 through approximately 2012, J.H. purported to own 49% of C3T.

15.     T.A. was a service-disabled veteran who, from 2006 through 2012, purported to be the 51% owner and president of C3T. In approximately December 2012, T.A. acquired J.H.'s shares of C3T and purported to be the 100% owner of C3T. For long stretches from 2007 through 2012, T.A. had virtually no involvement in C3T. Subsequently, T.A. became more involved in C3T, but Ganos, J.H., and others retained control over key aspects of C3T.

16.     Nuvo was a Wisconsin corporation that performed construction work and purported to provide ready-mix concrete. Nuvo's office was located in the Florist Avenue building. As noted, J.L. was Nuvo's nominal president and 85% owner. Ganos purported to own only 15% of Nuvo and to serve only as its vice president. Nuvo was certified by the SBA under the 8(a) Program as a Small Disadvantaged Business from 2004 until it graduated from the 8(a) Program in 2013. From 2005 to at least 2016, Nuvo was also certified by Milwaukee County as a DBE to provide ready-mix concrete.

17.     C3T was a Wisconsin corporation that performed construction work. C3T's office was located in the Florist Avenue building. As noted, T.A. was C3T's purported president and majority owner. C3T was certified under the VA's SDVOSB program from 2006 to at least 2016, except for certain periods during which it was suspended.

18.     Pagasa was a Wisconsin corporation purportedly owned by O.M., an Asian-Pacific American female. O.M. was a project manager for C3T from 2009 to approximately 2016, and worked in the Florist Avenue building. With the assistance of Ganos, J.H., and others, O.M. formed Pagasa and obtained certification from the SBA under the 8(a) Program for Pagasa in September 2015.

5

19.     Sonag Ready Mix was a Wisconsin limited liability company owned by Sonag Company and N.R. It principally provided ready-mix concrete for construction projects. The concrete operations were located in Menomonee Falls, Wisconsin, and several sites in Milwaukee, Wisconsin. From at least 2002 to approximately 2015, Sonag Ready Mix's business operations were conducted mainly in an office in Menomonee Falls, Wisconsin. Since 2015, Sonag Ready Mix's business operations were conducted mainly in an office on West Hampton Avenue in Milwaukee, Wisconsin.

### Manner and Means of the Conspiracy and Scheme

The manner and means by which the conspiracy and scheme to defraud were sought to be accomplished included, among others, the following:

20.     Ganos and others controlled and operated the following companies that had straw owners:

a.     Nuvo, with straw owner J.L., who qualified as socially and economically disadvantaged;

b.     C3T, with straw owner T.A., who qualified as a service-disabled veteran; and

c.     Pagasa, with straw owner O.M., who qualified as socially and economically disadvantaged.

21.     The straw owners did not have the benefits or burdens of ownership, nor did they have actual control of the companies. Instead, Ganos and others exercised control over key aspects of the companies, including long-term strategic decisions, finances, bonding, personnel, compensation, and day-to-day operations.

22.     Ganos and others made arrangements to provide the companies with critical support, including start-up financing, bonding, equipment, space in the Florist Avenue building, management, personnel, and accounting services.

6

23.     Ganos and others submitted and caused to be submitted applications and

subsequent submissions to the small business programs to obtain and maintain small business

certifications for the companies as follows:

a.     In June 2004, Nuvo's application to the 8(a) Program was submitted to the SBA. Subsequently, Ganos and others caused Nuvo's 8(a) annual updates to be submitted to the SBA until Nuvo graduated from the 8(a) Program in 2013.

b.     In June 2005, Nuvo's application was submitted to Milwaukee County requesting that Nuvo's previously-obtained DBE certification be expanded to include Ready Mix Concrete and Trucking. Subsequently, Ganos and others caused the periodic submission of No Change Affidavits, swearing there had been no material change that would affect Nuvo's eligibility for DBE certification. The most recent No Change Affidavit was submitted in October 2015.

c.     In April 2006, C3T began holding itself out as an SDVOSB. Subsequently, Ganos and others caused the submission of an application to the CVE to verify C3T as an SDVOSB, as well as later submissions claiming C3T's eligibility to be reverified as an SDVOSB. These included submissions to the CVE for reverification in July 2015.

d.     In February 2015, Pagasa's application to the SBA's 8(a) Program was submitted. Subsequent submissions to SBA were made to maintain Pagasa's 8(a) certification.

24.     The applications and subsequent submissions to the small business programs to

obtain and maintain the small business certifications contained materially false representations,

including the following:

a.     False representations that the companies met the eligibility criteria for the programs;

b.     False representations that the straw owners devoted the requisite efforts to managing the companies;

c.     False representations that the straw owners had ultimate control over others involved in the companies;

d.     False representations regarding the straw owners' compensation from the companies in relation to the compensation received by others;

e.     False representations regarding the companies' reliance on others for critical support, such as start-up financing and bonding; and

7

f.   False representations regarding the companies' affiliation with each other and with Ganos, Sonag Company, and Sonag Ready Mix.

25.   Ganos and others caused Nuvo, C3T, and Pagasa to submit their registration and annual representations and certifications in GSA databases. These submissions falsely represented that the companies met the respective small business programs' eligibility criteria.

26.   Steps were taken to create and maintain the false appearance that the companies satisfied the small business programs' eligibility criteria. Such steps included:

a.   Preparing J.L. and T.A. for interviews with small business program representatives so they could appear to be actively managing Nuvo and C3T;

b.   Arranging for others routinely to execute contracts, checks, and other documents in J.L.'s and T.A.'s name; and

c.   Giving others access to J.L.'s and T.A.'s email accounts so that emails could be sent and received in their names.

27.   Steps were taken to make it appear that Nuvo provided ready-mix concrete and trucking independently when, in truth, Nuvo's concrete operations depended heavily on Sonag Ready Mix. These steps included:

a.   Arranging for Sonag Ready Mix employees to prepare quotes for concrete, to process concrete orders, and then to send invoices in Nuvo's name for delivered concrete;

b.   Arranging for Sonag Ready Mix's concrete facilities to fill concrete orders placed with Nuvo; and

c.   Arranging for the same employees who handled the hiring and supervision of Sonag Ready Mix drivers to handle the hiring and supervision of drivers paid through Nuvo's payroll.

28.   In consultation with Spindler, Ganos and others directed bookkeeping, accounting, and payroll procedures and transactions that facilitated and concealed the scheme, including the following:

8

a.      Arranging for J.L.'s compensation from SWMHP to be paid through Nuvo's payroll;

b.      Creating false records to make it appear that T.A. had received additional income that would make him the highest compensated C3T employee, even though he had not received the income; and

c.      Implementing procedures to pass through all revenue and expenses—and therefore all profits—associated with Nuvo concrete sales to Sonag Ready Mix.

29.      Ganos, Spindler, and others held regular meetings to review the financial performance of Ganos-controlled companies, including Nuvo and C3T. Through these meetings and other interactions, Spindler knew that Ganos and others besides the straw owners controlled Nuvo and C3T, and that the companies did not meet the eligibility criteria for the small business programs. Spindler further knew that Nuvo and C3T were obtaining federal construction contracts and concrete purchase orders that were set aside under small business programs.

30.      Ganos, Spindler, and others prepared, and caused to be prepared, two sets of financial statements for Sonag Company, Nuvo, C3T, and Sonag Ready Mix: (a) individual financial statements that showed each company's financial results on its own; and (b) consolidated financial statements that showed the companies' combined financial results. To conceal the companies' affiliation, only the individual financial statements—and not the consolidated financial statements—were submitted to small business program representatives.

31.      Ganos and others arranged for the companies to secure the necessary bonding for federal construction contracts based upon the companies' consolidated financial statements and indemnification agreements that pledged Ganos's personal assets and Sonag Company's assets in support of Nuvo, C3T, and Pagasa. This arrangement was not disclosed to small business program representatives. Instead, at Ganos's request, the bonding agent provided letters to small business program representatives that explained Nuvo's, C3T's, and Pagasa's bonding by

9

reference only to their individual resources. The letters omitted any reference to the companies' consolidated financial statements or Ganos's and Sonag Company's guarantees.

32. Ganos and others used, and caused to be used, the fraudulently obtained small business certifications to win numerous federal construction contracts set aside for Small Disadvantaged Businesses or SDVOSBs, and concrete purchase orders for projects with DBE requirements.

33. The fraudulently obtained federal set-aside contracts and concrete purchase orders were performed by various combinations of employees, equipment, and resources of Sonag Company, Nuvo, C3T, Sonag Ready Mix, and Pagasa.

34. Throughout the conspiracy and scheme, Nuvo and C3T used interstate wires and the United States mail to submit numerous claims for payments on federal construction contracts set aside for Small Disadvantaged Businesses or SDVOSBs, and concrete purchase orders for projects with DBE requirements.

35. In the course of the conspiracy and scheme, Nuvo and C3T received over $200 million dollars in payments for set-aside contracts and concrete purchase orders to which Nuvo and C3T were not entitled because they did not actually meet the small business program eligibility requirements. Many of the payments were transmitted to Nuvo and C3T by means of interstate wires and United States mail.

36. The conspirators shared in the proceeds of the conspiracy and scheme to varying extents with Ganos drawing significantly more monies than the straw owners.

## Concealment of the Conspiracy and Scheme

37. On multiple occasions throughout the conspiracy, the conspirators engaged in efforts to conceal the scheme and to obstruct investigations by small business program representatives. The efforts included the following:

10

a.    In June 2006, Milwaukee County inquired whether Nuvo acted independently of Ganos and Sonag Ready Mix in providing concrete. In response, Ganos and others sent a letter in J.L.'s name that falsely claimed that J.L. made all final decisions over Nuvo's concrete operations, and that Ganos did not "have any significant control or decision-making authority." As a result, Milwaukee County allowed Nuvo to retain its DBE status.

b.    In March 2009, Ganos and others responded to a CVE inquiry regarding C3T's relationship to Nuvo and C3T's ability to obtain substantial bonding. The response fraudulently represented that C3T was independent and did not disclose C3T's relationship with Ganos or the other companies. As a result, the CVE maintained C3T's verification as an SDVOSB.

c.    In July 2010, Ganos and others responded to inquiries by Milwaukee County and the Wisconsin Department of Transportation regarding Nuvo's relationship to Sonag Ready Mix. The responses contained false and fraudulent representations, including the submission of a purported lease and rental payments between Nuvo and Sonag Ready Mix for use of a concrete facility. In truth, the lease was created and back-dated in response to the inquiry, and the "rent payments" were actually revenues being passed through Nuvo to Sonag Ready Mix. As a result, Milwaukee County allowed Nuvo to retain its DBE status.

d.    In November 2012, the CVE denied C3T's request for reverification in the SDVOSB Program because, among other reasons, it appeared that J.H. exercised control over T.A. In approximately January 2013, Ganos and others submitted, and caused to be submitted, a request to the CVE to reverify C3T as an SDVOSB. The request falsely represented that J.H. had left C3T and that T.A. had assumed full control of J.H.'s duties. The request omitted the material fact that J.H. was being paid by Pagasa and continued to manage C3T projects actively from an office located adjacent to C3T's office. As a result, the CVE reverified C3T as an SDVOSB.

38.    In 2012, the VA Office of Inspector General and the Federal Bureau of Investigation conducted a criminal investigation into, among other things, C3T's eligibility for SDVOSB status. Criminal investigators interviewed Ganos and Spindler, among others. Ganos and Spindler each gave materially false statements, denying that C3T had any affiliation with Nuvo or Sonag Company.

All in violation of Title 18, United States Code, Section 1349.

11

Case 2:18-cr-00062-PP-DEJ   Filed 05/01/18   Page 11 of 27   Document 25
Case 2:19-mj-00915-NJ   Filed 08/29/19   Page 69 of 85   Document 1

## COUNTS TWO THROUGH FIVE
(Wire Fraud Involving Nuvo 8(a) Contracts)

**THE GRAND JURY FURTHER CHARGES:**

39.     Paragraphs 1 through 38 of this Indictment are realleged and incorporated here as

constituting the scheme to defraud and to obtain money by means of materially false and

fraudulent pretenses, representations, and promises, and the following is further alleged.

40.     On or about the dates listed below, in the State and Eastern District of Wisconsin,

## BRIAN L. GANOS and
## NUVO CONSTRUCTION COMPANY, INC.,

for the purpose of executing and carrying out the above scheme and attempting to do so, caused

wire communications to be transmitted in interstate commerce, as follows:

| Count | Date | Description |
|-------|------|-------------|
| 2 | Aug. 19, 2013 | Construction Payment Invoice for $226,323.36 submitted by Nuvo, Milwaukee, Wisconsin, through the Internet to the Defense Logistics Agency, Ogden, Utah, for work on Army contract no. W911SA-10-D-0002. |
| 3 | Feb. 18, 2014 | Construction Payment Invoice for $146,880.00 submitted by Nuvo, Milwaukee, Wisconsin, through the Internet to the Defense Logistics Agency, Ogden, Utah, for work on Army contract no. W911SA-10-D-0002. |
| 4 | Nov. 30, 2015 | Construction Payment Invoice for $150,363.99 submitted by Nuvo, Milwaukee, Wisconsin, through the Internet to the Defense Logistics Agency, Ogden, Utah, for work on Army contract no. W911SA-12-D-0008. |
| 5 | Dec. 7, 2015 | Construction Payment Invoice for $360,354.65 submitted by Nuvo, Milwaukee, Wisconsin, through the Internet to the Defense Logistics Agency, Ogden, Utah, for work on Army contract no. W911SA-12-D-0008. |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

12

## COUNTS SIX THROUGH NINE
### (Wire Fraud Involving C3T)

**THE GRAND JURY FURTHER CHARGES:**

41.    Paragraphs 1 through 38 of this Indictment are realleged and incorporated here as

constituting the scheme to defraud and to obtain money by means of materially false and

fraudulent pretenses, representations, and promises, and the following is further alleged.

42.    On or about the dates listed below, in the State and Eastern District of Wisconsin,

### BRIAN L. GANOS,

for the purpose of executing and carrying out the above scheme and attempting to do so, caused

wire communications and electronic fund transfers to be transmitted in interstate commerce, as

follows:

| Count | Date | Description |
|-------|------|-------------|
| 6 | May 7, 2014 | $555,368.36 wire transfer from the Federal Reserve Bank, East Rutherford, New Jersey, to BMOHarris Bank account no. –5866, Naperville, Illinois, in the name of C3T, as payment for work on VA contract no. VA263-14-C-0058. |
| 7 | April 24, 2015 | $500,445.51 wire transfer from the Federal Reserve Bank, East Rutherford, New Jersey, to BMOHarris Bank account no. –5866, Naperville, Illinois, in the name of C3T, as payment for work on VA contract no. VA69D-14-C-0229. |
| 8 | May 28, 2015 | $480,656.72 wire transfer from the Federal Reserve Bank, East Rutherford, New Jersey, to BMOHarris Bank account no. –5866, Naperville, Illinois, in the name of C3T, as payment for work on VA contract no. VA69D-14-C-0229. |
| 9 | Jan. 8, 2016 | $476,208.00 wire transfer from the Federal Reserve Bank, East Rutherford, New Jersey, to BMOHarris Bank account no. –5866, Naperville, Illinois, in the name of C3T, as payment for work on VA contract no. VA263-14-C-0058. |

Each in violation of Title 18, United States Code, Sections 1343 and 2.

13

Case 2:18-cr-00062-PP-DEJ   Filed 05/01/18   Page 13 of 27   Document 25
Case 2:19-mj-00915-NJ   Filed 08/29/19   Page 71 of 85   Document 1

## COUNTS TEN THROUGH THIRTEEN
### (Mail Fraud Involving Nuvo's DBE Contracts)

## THE GRAND JURY FURTHER CHARGES:

43.     Paragraphs 1 through 38 of this Indictment are realleged and incorporated here as

constituting the scheme to defraud and to obtain money by means of materially false and

fraudulent pretenses, representations, and promises, and the following is further alleged.

44.     On or about the dates listed below, in the State and Eastern District of Wisconsin,

### BRIAN L. GANOS and
### NUVO CONSTRUCTION COMPANY, INC.,

for the purpose of executing and carrying out the above scheme and attempting to do so, caused

to be delivered by United States mail, according to the direction thereon, and to whom it was

addressed, the matter listed below.

| Count | Date | Description |
|-------|------|-------------|
| 10 | Sept. 24, 2014 | Mailing of Nuvo invoice nos. 31701, 31702, 31754, 31812, 31857, and 31900, totaling $41,871.84, from Sonag Ready Mix, on behalf of Nuvo, to Zenith Tech, Inc., Waukesha, WI, seeking payment for work on State Highway 20 in Racine County. |
| 11 | April 29, 2015 | Mailing of Nuvo invoice nos. 36679, 36680, 36745, and 36801, totaling $8,258.18, from Sonag Ready Mix, on behalf of Nuvo, to J.P. Cullen & Sons, Inc., Janesville, WI, seeking payment for work on the Milwaukee Amtrak Station. |
| 12 | Oct. 29, 2015 | Mailing of Nuvo invoice nos. 44038, 44109, 44189, 44190, 44243, 44375, 44507, 44528, 44603, 44833, 120749, and 121087 totaling $42,608.77, from Sonag Ready Mix, on behalf of Nuvo, to J&A Pohl, Brookfield, WI, seeking payment for work on Layton Avenue in Milwaukee County. |
| 13 | Dec. 11, 2015 | Mailing of Nuvo invoice nos. 122101, 122103, 122148, 122191, and 122248, totaling $8,498.16, from Sonag Ready Mix, on behalf of Nuvo, to J.P. Cullen & Sons, Inc., Janesville, WI, seeking payment for work on the Milwaukee Amtrak Station. |

Each in violation of Title 18, United States Code, Sections 1341 and 2.

14

## COUNT FOURTEEN
### (Money Laundering Conspiracy)

**THE GRAND JURY FURTHER CHARGES:**

45. Paragraphs 1 through 44 of this Indictment are realleged and incorporated here and the following is further alleged.

46. Beginning no later than 2007 and continuing through at least August 2016, in the State and Eastern District of Wisconsin and elsewhere,

### BRIAN L. GANOS and
### SONAG COMPANY, INC.

knowingly conspired with each other and with other persons and entities known and unknown to the Grand Jury, including L.M. and Ganos-controlled entities Sonag I, LLC and Trinity Marketing Services, Inc. ("Trinity Marketing"), to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit: To knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, mail fraud and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and knowing that, while conducting and attempting to conduct such financial transactions, the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

### Manner and Means

The manner and means used to accomplish the objectives of the conspiracy included, among others, the following:

47.     Ganos and others, including entities Ganos controlled, engaged in financial transactions that involved proceeds of federal set-aside contracts and transportation projects subject to DBE requirements, which Nuvo and C3T obtained fraudulently through the scheme described above in paragraphs 1 to 38.

48.     Ganos conspired with L.M. and Sonag Company to engage in the types of financial transactions described in paragraph 47 above and paragraphs 49 to 53 below, for the purpose of transferring the proceeds of the scheme from accounts held in the names of Nuvo and C3T and into accounts and assets held in the names of Ganos-controlled entities, including Sonag Company, Sonag I, LLC, and Trinity Marketing, in a manner intended to disguise and conceal, among other things: (a) the nature of those proceeds, namely, that they were obtained via the fraud scheme; (b) the source of those proceeds, namely, that they came from contract money paid to Nuvo or C3T; (c) the location of those proceeds, in that Ganos's movement of the funds from Nuvo and C3T accounts through accounts associated with Ganos-controlled entities helped to conceal the ultimate location of the contract payments that originally had been paid to Nuvo and C3T; and (d) the true ownership of those criminally derived proceeds.

49.     Ganos and others caused transfers of funds from Nuvo's and C3T's accounts to Sonag I, LLC, via transactions recorded in accounting entries as "rent," but in amounts that exceeded the monthly rental amounts that Nuvo and C3T were supposedly obligated to pay Sonag I under lease agreements for Nuvo's and C3T's occupancy of the Florist Avenue building. Ganos and others used those substantial extra rental payments to transfer sums, including proceeds of the scheme, from Nuvo and C3T accounts to a Sonag I account that Ganos controlled. Ganos and Sonag I thus used the Florist Avenue building, where Nuvo and C3T leased space from Sonag I, to facilitate this conspiracy to engage in concealment money laundering of the proceeds of the scheme.

16

50. From approximately January 2011 to approximately May 2016, Ganos, Sonag

Company, Inc., and others caused multiple financial transactions that transferred $3,000,000

from Nuvo and C3T accounts to investment accounts in Sonag Company's name.

51. Ganos and others caused transfers of $731,576.22 from one Nuvo account to

another Nuvo account, and then to fund the purchase a condominium in Winter Park, Colorado,

that was titled the name of Trinity Marketing, as follows:

| Date | Description |
|------|-------------|
| Mar. 8, 2013 | Transfer of $700,000 from Tri City National Bank account no. –3755, held in the name of Nuvo, to Tri City National Bank account no. –2357, held in the name of Nuvo. |
| April 2, 2013 | Transfer of $50,000 from Tri City National Bank account no. –3755, held in the name of Nuvo, to Tri City National Bank account no. –2357, held in the name of Nuvo. |
| April 2, 2013 | Wire transfer of $731,576.22 from Tri City National Bank account no. –2357, held in the name of Nuvo, to Grand Mountain Bank account no. –2301, in the name of Grand County Title and Escrow, in Grand Lake, CO, for the purchase of a condominium in Winter Park, CO. |

52. Ganos and others caused transfers of $162,459.72 from a Nuvo account to a

Sonag Ready Mix account, and then $15,000 to a Trinity Marketing account, from which Ganos

purchased a 2014 Chevrolet Corvette titled in the name of Trinity Marketing/Ganos, as follows:

| Date | Description |
|------|-------------|
| Sept. 5, 2013 | Withdrawal of $162,459.72 from Tri City National Bank account no. –2357, held in the name of Nuvo, by three checks deposited into Tri City National Bank account no. –3704, held in the name of Sonag Ready Mix (check #14188 for $47,662.95; check #14186 for $23,000; and check #14187 for $91,796.77). |
| Sept. 9, 2013 | Withdrawal of $15,000 from Tri City National Bank account no. –3704, in the name of Sonag Ready Mix, by check no. #46362 deposited into Wells Fargo Bank account no. –4029, held in the name of Trinity Marketing. |

| | Withdrawal of $72,098.64 from Wells Fargo Bank account no. –4029, held |
|---|---|
| April 11, 2014 | in the name of Trinity Marketing, by check #1040 paid to the order of "Holz Motors, Inc." for the purchase of a 2014 Chevrolet Corvette. |

53.     Ganos and others caused transfers of $75,000 from a C3T account to a Trinity

Marketing account, even though Trinity Marketing had not performed any services for C3T, as

follows:

| Date | Description |
|---|---|
| April 13, 2015 | Withdrawal of $25,000 from BMO Harris account no. --5866, held in the name of C3T, by check #12953 deposited into Wells Fargo Bank account no. –4029, held in the name of Trinity Marketing. |
| July 29, 2015 | Withdrawal of $50,000 from BMO Harris account no. –5866, held in the name of C3T, by check #13351 deposited into Wells Fargo Bank account no. –4029, held in the name of Trinity Marketing. |

All in violation of Title 18, United States Code, Section 1956(h).

18

Case 2:18-cr-00062-PP-DEJ   Filed 05/01/18   Page 18 of 27   Document 25
Case 2:19-mj-00915-NJ   Filed 08/29/19   Page 76 of 85   Document 1

## COUNTS FIFTEEN TO SEVENTEEN
### (Concealment Money Laundering)

**THE GRAND JURY FURTHER CHARGES:**

54. Paragraphs 1 through 53 of the Indictment are realleged and incorporated here and the following is further alleged.

55. On or about the dates listed below, in the State and Eastern District of Wisconsin,

## BRIAN L. GANOS

knowingly conducted and attempted to conduct each of the financial transactions specified below.

56. Each transaction occurred through a financial institution and occurred in and affected interstate commerce.

57. Each transaction involved proceeds of a specified unlawful activity, that is mail fraud and wire fraud in violation of Title 18, United States Code, Sections 1341 and 1343, as previously described.

58. While conducting each of the financial transactions, Ganos knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity.

59. While conducting each of the financial transactions, Ganos knew that the financial transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity.

| Count | Date | Description |
|-------|------|-------------|
| 15 | April 11, 2014 | Withdrawal of $72,098.64 from Wells Fargo Bank account no. – 4029, held in the name of Trinity Marketing, by check #1040 paid to the order of "Holz Motors, Inc." for the purchase of a 2014 Chevrolet Corvette. |

19

| 16 | April 13, 2015 | Withdrawal of $25,000 from BMO Harris account no. –5866, held in the name of C3T, by check #12953 deposited into Wells Fargo Bank account no. –4029, held in the name of Trinity Marketing. |
|----|----------------|---|
| 17 | July 29, 2015 | Withdrawal of $50,000 from BMO Harris account no. –5866, held in the name of C3T, by check #13351 deposited into Wells Fargo Bank account no. –4029, held in the name of Trinity Marketing. |

All in violation of Title 18, United States Code Sections 1956(a)(1)(B)(i) and 2.

20

Case 2:18-cr-00062-PP-DEJ   Filed 05/01/18   Page 20 of 27   Document 25
Case 2:19-mj-00915-NJ   Filed 08/29/19   Page 78 of 85   Document 1

## COUNTS EIGHTEEN TO TWENTY-FOUR
### (Unlawful Financial Transactions)

**THE GRAND JURY FURTHER CHARGES:**

60.     Paragraphs 1 through 38 of the Indictment are realleged and incorporated here as

constituting the scheme to defraud and to obtain money by means of materially false and

fraudulent pretenses, representations, and promises, and the following is further alleged.

61.     On or about the listed dates, in the State and Eastern District of Wisconsin,

### BRIAN L. GANOS

knowingly engaged in the below-listed monetary transactions.

62.     Each transaction occurred through a financial institution and occurred in and

affected interstate commerce.

63.     Ganos knew that each transaction involved criminally derived property.

64.     The criminally derived property in each transaction had a value greater than

$10,000.

65.     The property used in each of the below-listed monetary transactions was derived

from specified unlawful activity, namely, mail and wire fraud in violation of Title 18, United

States Code, Sections 1341 and 1343, as previously described.

| Count | Date | Description |
|-------|------|-------------|
| 18 | Jan. 8, 2015 | Transfer of various securities having a value of $857,884.35 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| 19 | Jan. 9, 2015 | Transfer of various securities having a value of $1,248,254.94 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |

21

| 20 | Feb. 6, 2015 | Transfer of various securities having a value of $45,419.94 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
|---|---|---|
| 21 | Feb. 9, 2015 | Transfer of various securities having a value of $395,668.98 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| 22 | Feb. 10, 2015 | Transfer of $41,950.00 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| 23 | Feb. 11, 2015 | Transfer of various securities having a value of $461,741.78 from UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBO USB Bank USA" to UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA." |
| 24 | May 24, 2016 | Transfer of $860,000 from UBS account no. -0703, in the name of "Sonag Company Inc., Pleg'd Coll Acct-FBO UBS Bank USA," to UBS account no. -0589, in the name of "Sonag Company Inc., Pleg'd Coll Acc-FBBO USB Bank USA." |

Each in violation of Title 18, United States Code, Sections 1957 and 2.

22

Case 2:18-cr-00062-PP-DEJ  Filed 05/01/18  Page 22 of 27  Document 25
Case 2:19-mj-00915-NJ  Filed 08/29/19  Page 80 of 85  Document 1

## COUNT TWENTY-FIVE
### (Misprision of Felony)

**THE GRAND JURY FURTHER CHARGES:**

66.    Paragraphs 1 through 65 of the Indictment are realleged and incorporated here, and it is further alleged as follows.

67.    On or about May 21, 2014, in the State and Eastern District of Wisconsin,

### MARK F. SPINDLER,

having knowledge that Brian L. Ganos committed the crime of conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h), failed to notify as soon as possible an authority under the United States that the crime had been committed and instead took affirmative steps to conceal the crime; namely, Spindler prepared an Independent Accountant's Review Report for C3T as of December 31, 2012, and December 31, 2013, that contained false representations regarding amounts of monies that had been transferred at Ganos's direction from C3T to Sonag Company. These representations included (a) understating the amounts of monies that had been transferred from C3T to Sonag Company, and (b) falsely stating that Sonag Company had provided $325,000 of services to C3T when, in reality, no such services had been provided.

All in violation of Title 18, United States Code, Section 4.

23

## FORFEITURE NOTICE

68. Upon conviction of one or more of the wire and mail fraud offenses, in violation of Title 18, United States Code, Sections 1341 and 1343, set forth in Counts One through Thirteen of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the wire fraud offense or offenses of conviction. The property to be forfeited includes, but is not limited to:

    a.    The real property commonly known as 201 Zephyr Way, #2800, Winter Park, Colorado;

    b.    Approximately $1,349,496.00 in United States currency from UBS account no. -0703;

    c.    Approximately $879,740.02 in United States currency from UBS account no. -0589;

    d.    A sum of money equal to the proceeds derived from the wire or mail fraud offense or offenses of conviction;

    e.    As to Counts 1 through 5 and 10 through 13, the property to be forfeited also includes all right, title, and interest in Nuvo Construction Company, Inc.; and

    f.    As to Counts 1 and 6 through 9, the property to be forfeited also includes all right, title, and interest in C3T, Inc.

69. Upon conviction of the money laundering conspiracy offense, in violation of Title 18, United States Code, Section 1956(h), set forth in Count Fourteen of this Indictment, the defendants shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the money laundering offense or offenses of conviction, and any property traceable to such property, including, but not limited to:

    a.    The real property commonly known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin;

24

b. The real property commonly known as 201 Zephyr Way, #2800, Winter Park, Colorado;

c. One 2014 Chevrolet Corvette Stingray Convertible bearing Vehicle Identification Number ("VIN") 1G1YE3D74E5117919;

d. Approximately $1,349,496.00 in United States currency from UBS account no. -0703;

e. Approximately $879,740.02 in United States currency from UBS account no. -0589;

f. All right, title, and interest in Sonag Company, Inc.;

g. All right, title and interest in Nuvo Construction Company, Inc.;

h. All right, title, and interest in C3T, Inc.;

i. All right, title, and interest in Sonag I, LLC;

j. All right, title, and interest in Trinity Marketing Services, Inc.; and

k. A sum of money equal to the value of the property involved in the money laundering offense or offenses of conviction.

70. Upon conviction of one or more of the money laundering offenses, in violation of Title 18, United States Code, Sections 1956 and 1957, set forth in Counts Fifteen through Twenty-Four of this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in the money laundering offense or offenses of conviction, and any property traceable to such property, including, but not limited to a sum of money equal to the value of the property involved in the money laundering offense or offenses of conviction.

a. As to Count 15, the property to be forfeited also includes: (i) One 2014 Chevrolet Corvette Stingray Convertible bearing VIN 1G1YE3D74E5117919, and (ii) all right, title, and interest in Trinity Marketing Services, Inc.

25

b. As to Counts 18 through 23, the property to be forfeited also includes approximately $1,349,496.00 in United States currency from UBS account no. -0703.

c. As to Count 24, the property to be forfeited also includes approximately $879,740.02 in United States currency from UBS account no. -0589.

71. If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 28, United States Code, Section 2461(c), up to the value of the forfeitable property described above, including but not limited to the following:

a. The real property commonly known as 5500 (to include 5510) West Florist Avenue, Milwaukee, Wisconsin;

b. The real property commonly known as 201 Zephyr Way, #2800, Winter Park, Colorado;

c. One 2014 Chevrolet Corvette Stingray Convertible bearing VIN 1G1YE3D74E5117919;

d. One 2016 Cadillac Escalade bearing VIN 1GYS4HKJ4GR416084;

e. Approximately $1,349,496.00 in United States currency from UBS account no. -0703;

f. Approximately $879,740.02 in United States currency from UBS account no. -0589;

g. The real property commonly known as S70W17655 Muskego Drive, Muskego, Wisconsin;

h. The real property commonly known as N52W34254 Gietzen Drive, Oconomowoc, Wisconsin 53069;

26

i.  All right, title, and interest in Sonag Company, Inc.;

j.  All right, title, and interest in Nuvo Construction Co., Inc.;

k.  All right, title, and interest in C3T, Inc.;

l.  All right, title, and interest in Sonag Ready Mix, LLC;

m.  All right, title, and interest in Sonag I, LLC;

n.  All right, title, and interest in Trinity Marketing Services, Inc.;

o.  All right, title, and interest in Grand C Trucking, LLC;

p.  All right, title, and interest in ARS Properties LLC;

q.  All right, title, and interest in MC Properties LLC;

r.  All right, title, and interest in JAX Properties LLC; and

s.  All right, title, and interest in LJ Properties LLC.

A TRUE BILL:

FOREPERSON

Dated: _5/1/18_

MATTHEW D. KRUEGER
United States Attorney

27

Case 2:18-cr-00062-PP-DEJ   Filed 05/01/18   Page 27 of 27   Document 25
Case 2:19-mj-00915-NJ   Filed 08/29/19   Page 85 of 85   Document 1